**FORT PITT BREWING CO.**

v.

**COMMISSIONER OF INTERNAL REVENUE.**

No. 11133.

United States Court of Appeals Third Circuit.

Argued Jan. 5, 1954.

Decided Feb. 11, 1954.

Rehearing Denied March 11, 1954.

R. J. Cleary, Pittsburgh, Pa. (James H. Beal, Sidney B. Gambill, Robert F. Banks, Pittsburgh, Pa., on the brief), for petitioner.

Carolyn R. Just, Washington, D. C. (H. Brian Holland, Asst. Atty. Gen., Ellis N. Slack, A. F. Prescott, Sp. Assts. to the Atty. Gen., on the brief), for respondent.

Before GOODRICH, STALEY and HASTIE, Circuit Judges.

HASTIE, Circuit Judge.

We are asked to decide whether, in the particular circumstances of this case, Section 41 of the Internal Revenue Code justified the Commissioner of Internal Revenue in making "adjustments" of the Fort Pitt Brewing Company's gross income for 1942 and 1943, adding to income the amount of the net increase during each taxable year of the taxpayer's accounting "Reserve for Returnable Containers".

Section 41 provides that "if the method [of accounting] employed [by a taxpayer] does not clearly reflect the income, the computation shall be made in accordance with such method as in the opinion of the Commissioner does clearly reflect the income." 26 U.S.C., 1946 ed., § 41. Also in force at the times in question and implementing Section 41 was Section 29.41–1 of Treasury Regulation 111 which required that "The time as of which any item of gross income or any deduction is to be accounted for must be determined in the light of the fundamental rule that the computation shall be made in such manner as clearly reflects the taxpayer's income." The Regulation provided further that where this is not accomplished by taxpayer's regular method of accounting, "the computation shall be made in such manner as in the opinion of the Commissioner clearly reflects * * * [income]."

Taxpayer, a Pennsylvania corporation, produces and sells large quantities of malt and brewed beverages. It maintains its accounts on the accrual basis. It provides returnable containers—bottles, kegs and barrels—in which it packages and distributes its products. A regulation of the Pennsylvania Liquor Control Board requires a stipulated minimum deposit on all returnable original containers of gallon size or less in which brewed beverages are sold. All of the taxpayer's invoices contain the following stipulation:

> "Deposit for return of package is as follows: Barrels $8.00, Half Barrels $6.00, Quarter Barrels $4.00 and Eighth Barrels $1.00 each, Cartons of 2 Dozen Small Bottles 50¢, Case of 2 Dozen Small Bottles 75¢, Bottles short in cases returned will be charged at rate of 2¢ for small bottles. Purchaser buys only the beer delivered and billed. Bottles, Cases, Kegs, Etc. containing the products delivered therein are never sold but remain absolute property of Brewing Company. Deposit for return of packages repaid purchaser for number delivered only on return of packages to Brewing Company. Purchaser agrees to these conditions."

No time limit is specified for the return of containers. During 1942 taxpayer received deposits of almost $5,000,000 on containers. During 1943 the

figure approached $6,000,000. Refunds in 1942 were nearly $100,000 less than deposits, and in 1943 over $200,000 less. A year by year picture of deposits, refunds and consequent bookkeeping accumulations is provided by the following table, with the taxable years italicized:

| Fiscal Year Ended Oct. 31, | Deposits Received | Deposits Refunded | Excess of Deposits Over Refunds | Balance in Reserve |
|---|---|---|---|---|
| 1936 Balance | | | | 17,962.50 |
| 1937 | 842,464.25 | 832,179.75 | 10,284.50 | 28,247.00 |
| 1938 | 1,214,122.75 | 1,184,063.25 | 30,059.50 | 58,306.50 |
| 1939 | 2,381,485.50 | 2,335,750.65 | 45,734.85 | 104,041.35 |
| 1940 | 3,063,054.00 | 3,035,347.75 | 27,706.25 | 131,747.60 |
| 1941 | 3,998,938.27 | 3,910,821.23 | 88,117.04 | 219,864.64 |
| *1942* | *4,822,919.50* | *4,739,947.90* | *82,971.60* | *302,836.24* |
| *1943* | *5,940,221.75* | *5,759,025.50* | *181,196.25* | *484,032.49* |
| 1944 | 7,587,196.25 | 7,457,638.00 | 129,558.25 | 613,590.74 |
| 1945 | 7,500,625.50 | 7,400,878.25 | 99,747.25 | 713,337.99 |
| 1946 | 8,176,090.50 | 8,034,014.00 | 142,076.50 | 855,414.49 |
| 1947 | 9,824,681.00 | 9,601,216.32 | 223,464.68 | 1,078,879.17 |
| 1948 | 12,225,591.00 | 12,144,419.25 | 81,171.75 | 1,160,050.92 |
| 1949 | 12,260,618.50 | 12,364,799.00 | (104,180.50) | 1,055,870.42 |
| 1950 | 10,112,643.00 | 10,090,142.75 | 22,500.25 | 1,078,370.67 |
| 1951 | 8,401,717.25 | 8,455,950.25 | (54,233.00) | 1,024,137.67 |

The foregoing table is a summary of data carried in taxpayer's books as a "liability account" under the title "Reserve for Returnable Containers." At no time have any of these transactions or their economic consequences been permitted to enter into taxpayer's computation of its gross income. Yet, at no time did taxpayer in any way segregate money thus deposited from ordinary income or restrict its use in the ordinary course of its business.

In argument taxpayer has sought to picture this "Reserve" as something in the nature of a trust fund. But taxpayer itself never really regarded or dealt with these container deposits as a trust fund, or even as an actual reserve. As we already have said, taxpayer mingled such receipts with its general funds using them indiscriminately in its business. No reserve fund for repayment of deposits was set aside at the end of the year, or at any other time. A "Reserve" existed on paper in the taxpayer's books of account, but in no other way. For purposes of comparison it seems worth noting that even the conventional bank deposit creates only a simple debt. Here the deposit for containers creates no more than a contractual obligation to repay the amount deposited, if and when the containers shall be returned.

But even though no trust is created, such a procedure of deposits and repayments is not designed for gain; yet, at times it may yield income. These characteristics are properly reflected in accounting and recognized in taxation. One familiar method of accounting for such transactions is based upon a conception of each cash deposit as security for the bailment of some article or articles, subject, however, to a mutual understanding that failure to return the property will result only in the discharge of the conditional obligation to repay the amount deposited. In this method of accounting, the distributed articles

remain in the distributor's inventory, subject to depreciation, even though possession has been surrendered to someone else and return is uncertain. The amounts deposited are set up in a special account and regarded as wholly or partially offset by concomitant liability to make repayment. If this offset is only partial, the unobligated balance goes into current income. If the offset is total, no income is said to be realized at that time. It is at this point in accounting, the determination of the relationship between deposits and offsetting liability, that the difficulties in this case begin.

Where great numbers of articles are distributed in the course of trade to many persons, some will never be returned. Where the articles are destructible and rather easily disposable containers it is obvious that a very considerable number will not be returned. It may be possible, largely on the basis of experience, to make a reasoned prediction of the percentage of the distributed articles which will not be returned. For this fraction of the deposits the theoretical offsetting repayment liability is not real. Accordingly, such offset will not be claimed when the fraction is determined in advance or at the end of each accounting period. Rather, the current account will show a minor fraction of the year's deposits with no offsetting liability, and this practically unobligated amount will be entered in the taxpayer's record of current income.

But in some situations it may not be feasible thus to approximate each year the percentage of current deposits which will never actually be required to meet repayment demands. So the taxpayer may elect to set up initially in its accounting for current deposits a theoretical 100 percent offsetting liability, with the result that there is no immediate determination of income, although in any given accounting period deposits may substantially exceed repayments. But if this is to be a bona fide and acceptable method of accounting it must be attended or followed by some fair and reasonably prompt determination or plan for determining at what time and in what amount any bookkeeping accumulation of actual deposits in excess of actual repayments shall be deemed to exceed future requirements for repayment and thus necessitate a transfer of the excess to surplus with attendant recognition of that sum as income.

The taxpayer here consistently from year to year maintained its accounts on the basis of a 100 percent offset of current deposits by a theoretical liability to make repayment for all containers. Yet, year by year its books revealed an increasing accumulation of an actual excess of deposits over repayments. This situation did not lead the taxpayer to adopt or propose any reasonable basis or time for a bookkeeping transfer of excess accumulations to an income category. Instead, taxpayer took and still defends the position that it may accumulate on its books indefinitely and without any restriction the excess of deposits over repayments. Thus an accounting procedure which, properly used, might legitimately have resulted in some postponement of accounting for sums as income until the amount thereof could be ascertained in fair approximation, has been misused to withhold the reporting of income indefinitely at the uncontrolled will and convenience of the taxpayer.

The impropriety of this procedure and the distorted picture of taxpayer's income it creates are the more glaring because of another accounting procedure which has been followed at the same time. We have already stated that all of taxpayer's containers, including those which were in the possession of the trade, were at all times carried in taxpayer's inventory. Moreover, each year in its accounting for income tax purposes taxpayer has claimed depreciation deductions on the cost of all of its containers at annual rates varying from 20 percent on bottles to 5 percent on barrels. This process necessarily results in a few years in an accounting recovery of substan-

tially the entire cost of every container. The cost of containers, reserve for depreciation and undepreciated cost as shown in taxpayer's books are as follows:

| Fiscal Year Ended October 31, | Total Cost | Reserve for Depreciation | Undepreciated Cost |
|---|---|---|---|
| 1936 | $ 70,231.47 | 7,023.15 | . . . . |
| 1937 | 100,928.47 | 9,260.66 | 91,667.81 |
| 1938 | 163,010.04 | 25,142.80 | 137,867.24 |
| 1939 | 258,362.95 | 51,334.14 | 207,028.81 |
| 1940 | 361,933.66 | 89,886.08 | 272,047.58 |
| 1941 | 481,391.01 | 144,891.32 | 336,499.69 |
| 1942 | 576,729.35 | 200,540.89 | 376,188.46 |
| 1943 | 666,368.03 | 254,981.61 | 411,386.36 |

It will be noted that in the taxable years alone the claimed container depreciation amounted to more than $100,000. Certainly, as the Tax Court found, some significant part of this annual depreciation must have represented loss and breakage of containers distributed to the trade. Yet, when it came to offsetting container deposits and preventing any part thereof from entering an income category, taxpayer claimed continuing full theoretical liability to pay for every container distributed since 1936. If a depreciation reserve for containers is maintained which recognizes and embraces some substantial loss and breakage of containers in the possession of the trade, certainly the so-called reserve for redemption of containers should be maintained, not at a theoretical maximum, but at a lesser figure similarly recognizing practical factors which reduce returns substantially below their theoretical maximum.

■ Here then is a clear and rather extreme case of accounting practice resulting in a substantial distortion of the picture of the taxpayer's income. The case plainly called for the exercise of the corrective function and powers of the Commissioner under the provisions of Section 41 and supplementary regulations set forth at the beginning of this opinion. It remains only to determine whether what the Commissioner did to correct this distorted picture was reasonable and proper.

We analyze and rationalize the Commissioner's action this way. It was clear to him that by 1942 a large part of the "reserve" in taxpayer's container deposit account was not supported by any real liability and, therefore, should be transferred to surplus and reported as income without further delay. The same was true of some fraction of the total additional deposits made in 1942 and in 1943. In the Commissioner's view this aggregation of amounts to be added to income through 1943 equalled or exceeded the entire excess of current deposits over current repayments in 1942 and 1943 which the taxpayer sought to withhold from income and add to its container reserve. So the Commissioner telescoped corrective procedures by leaving the reserve as it stood at the end of 1941 and treating as taxable income the entire net increase of deposits in 1942 and 1943.

Perhaps these processes will be made clearer by actual calculation on an assumed, though not fanciful, basis. The Tax Court pointed out that from 1936 to 1951 it was the experience of the taxpayer that total repayments were 1.15 percent less than total deposits. On this theory, taxpayer itself suggests 1.15 percent of total pre-1942 deposits or a little more than $130,000 might be a proper

transfer to surplus from pre-1942 accumulation. But this is only part of the picture. For, 1.15 percent of all deposits received in 1942 and 1943 must also be included to determine the total accumulation which on this theory would properly have been transferred to surplus and reported as income by the end of 1943. Thus augmented, the total of unreported income at the end of 1943 would be about $254,000 as compared with aggregate deficiencies of $264,000 actually assessed by the Commissioner for 1942 and 1943.

This $10,000 difference affords no substantial basis for complaint if we consider further that the use of 1.15 percent of total deposits to represent containers which never will be returned is rather favorable to the taxpayer. This is shown by the fact that at the end of 1943 more than 1½ percent of all containers distributed over the preceding years had not been returned.

 The Tax Court said, in justification of the Commissioner's action, " * * * it has not been shown that the amount added to income [i. e., the 1942 and 1943 excess deposits claimed as a 'reserve'] will ever be required to discharge any * * * liability [for refunds]." In the light of the entire foregoing analysis we cannot characterize that conclusion as clearly wrong. If the Commissioner's determination was an imprecise approximation, the taxpayer who caused the difficulty by obviously improper accounting must at least show rather clearly that the Commissioner's result is unjust. This has not been shown here.

At the same time, it should be pointed out that the rather offhand device of simply requiring that any excess of deposits over refunds during the taxable year be reported as income cannot fairly be continued indefinitely, or very long, on no more showing than is in this record. Indeed, the point must be reached rather quickly where the bookkeeping reserve for past years is not unreasonably large, and thereafter a small percentage of deposits received during the taxable year itself will suffice without more to reflect the income derived during that year from dealings with containers.

Finally, taxpayer argues that the sums derived from deposits which were treated as income in 1942 and 1943 are subject to capital gains treatment under Section 117 of the Internal Revenue Code, 26 U.S.C. § 117. Taxpayer asks that these sums be treated as recognized gain resulting from the involuntary conversion of property held for the required statutory period. We dispose of this argument by stating that the facts and findings in this record do not bring the gain in controversy within Section 117. Whether in this type of case on a different record a capital gains treatment under Section 117 could be justified, we need not and do not decide.

The judgment will be affirmed.