**E. I. DU PONT DE NEMOURS AND COMPANY**

v.

**UNITED STATES.**

No. 334–58.

United States Court of Claims.

April 7, 1961.

Newell W. Ellison, Washington, D. C., David C. Moore, Wilmington, Del., Rogers Pleasants, Wilmington, Del., Robert L. Randall, and Covington & Burling, Washington, D. C., on the brief, for plaintiff.

Jerry M. Hamovit, Washington, D. C., with whom was Charles K. Rice, Asst. Atty. Gen., James P. Garland, Lyle M. Turner, and Garry A. Pearson, Washington, D. C., on the brief, for defendant.

JONES, Chief Judge.

This is a suit for refund of taxes. Three separate claims are involved. The defendant has conceded plaintiff's right to recover on the third claim.

The two primary contested issues are:

1. When deposits are made to assure the return of certain pressurized gas cylinders, and the cylinders are not returned and the deposits are forfeited whether the excess of the deposits over the adjusted basis of the cylinders should be treated as capital gain or ordinary income.

2. Whether a taxpayer receives capital gain or ordinary income when he makes a nonexclusive transfer of certain rights in a secret process.

We will first take up the issue as to the cylinders.

The facts have been stipulated by the parties. Plaintiff is engaged in the manufacture and sale of industrial organic chemicals and related products. During 1950, plaintiff manufactured anhydrous ammonia, sulfur dioxide, and "Freon". These products were sold as compressed gases principally to large industrial concerns for use in refrigerating systems. The physical and chemical nature of the gases required that they be sold and delivered in heavy steel cylinders. The

cylinders were retained temporarily by the customers to store the gases. Ordinarily, when the cylinders were emptied they were returned to plaintiff.

Plaintiff required each of its customers who purchased the gases and took delivery in the pressurized cylinders to make a deposit on the cylinders. This deposit was required so as to secure the return of the cylinders. In each instance, the deposit was in excess of the average cost of the cylinders, thus providing an incentive for the customer to return the cylinder. Plaintiff wished to have the cylinders returned in order to avoid the additional administrative burdens involved in purchasing new replacements and testing and accounting for them in compliance with governmental regulations applicable to pressurized cylinders transported in interstate commerce.

During 1950, the documents providing for the sale of the refrigerant gases contained the following, or similar, provisions:

"All returnable containers used in connection with shipments of Seller's products are the property of the Seller and are loaned to the Buyer. Buyer shall use such containers only for reasonable storage of Seller's products originally delivered therein and shall return such containers in good condition within [90] days from date of original shipment. Buyer shall make a deposit as security for the return of such containers equal to Seller's current price therefor at the time of shipments, such deposit to be paid, without discount, when the invoice for the contents is paid. Upon return of such containers as above provided, with transportation charges prepaid to Seller's original shipping point, Seller shall credit Buyer with amount of said deposit; but if Buyer fails to return said containers in good condition and within the specified time, Seller may refuse to accept same and may retain said deposit."

When these products were sold in pressurized cylinders, plaintiff billed these customers for the product, stating separately the amount of the deposit and the price of the chemical product. For its internal accounting, the plaintiff placed the amount of the customers' deposits in a liability account denominated "Returnable Container Deposit." When the customers returned the containers, plaintiff decreased the amount of the liability account and distributed cash or gave credits to the customers' accounts. Because it desired the return of its cylinders, plaintiff made a practice of returning to the customers their deposits long after the usually specified 90-day period for return even when the cylinders had been damaged by the customers. In addition, plaintiff bore the cost of shipping its cylinders back to the plant location.

In 1950, plaintiff discovered that its customers had not returned an accumulating number of these cylinders although more than 3 years had elapsed since the date of their shipment. Accordingly, plaintiff determined to appropriate the deposits and made an entry on its books reducing the amount of the returnable containers deposit liability account and increasing general income.

Plaintiff claims that the profit element of this income is entitled to capital gain treatment. The Commissioner of Internal Revenue taxed the gain as ordinary income. Plaintiff paid the tax and now sues for a refund of taxes for the year 1950.

Various problems have arisen with respect to the tax treatment of income from the disposition of refillable containers. Some rules are evident and uncontested here. If the container is actually sold along with the contents and title passes to the customer, the price at which the container is billed is deemed to be income at the time of sale. Okonite Co. v. Commissioner, 1945, 4 T.C. 618, affirmed on other issues 3 Cir., 1946, 155 F.2d 248, certiorari denied 1946, 329 U.S. 764, 67 S.Ct. 125, 91 L.Ed. 658. This rule applies even if the manufacturer has agreed to repurchase the container at the same price. La Salle Ce-

ment Co. v. Commissioner, 7 Cir., 59 F.2d 361, certiorari denied La Salle Cement Co. v. Burnet, 1932, 287 U.S. 624, 53 S.Ct. 79, 77 L.Ed. 542. In the absence of an immediate sale, deposits received as security are not income at the time received. Wichita Coca Cola Bottling Co. v. United States, 5 Cir., 1945, 152 F.2d 6, certiorari denied 1946, 327 U.S. 806, 66 S.Ct. 964, 90 L.Ed. 1031. But when unclaimed deposits are closed out, then income is received. Wichita, supra. If the manufacturer has credited to surplus in one year a substantial amount of these deposits which have been accumulating over a period of years, a tax applies in that year to the entire amount, and no averaging is permitted. Fort Pitt Brewing Co. v. Commissioner, 3 Cir., 210 F.2d 6, certiorari denied 1954, 347 U.S. 989, 74 S.Ct. 851, 98 L.Ed. 1123. Furthermore, the Commissioner has the right to reallocate sums from a deposit liability account to a general income account when the time for return has expired and it seems reasonable that some of the deposits will not be refunded. Fort Pitt, supra. Dealers have enjoyed a reasonable degree of latitude in the exercise of their discretion as to how many containers will not be returned. Nehi Beverage Co. v. Commissioner, 1951, 16 T.C. 1114. See also Reg. 111 § 29.22(c)1.

The Government does not here allege that the plaintiff sold the containers along with the compressed gases, or that the plaintiff did not properly account for the container deposits by first placing them in a deposit liability account and then moving them to an income account. Furthermore, the Commissioner has ruled that the cylinders need not be inventoried by the plaintiff, and are subject to an allowance for depreciation. He stated as follows:

> "On the basis of the facts presented, it is concluded, with respect to the first question, [depreciation] that the essential elements for treating the containers as property used in trade or business, such as retention of title, the treatment thereof as separate items on the sales invoices, and the proper reflection of the basis thereof in the books and records, are present. It is accordingly held that, under the circumstances presented, the containers here under consideration constitute depreciable business property within the meaning of section 167 of the Code [26 U.S.C.A. § 167]." [Rev. Rul. 58–77, 1958–1 Cum.Bull. 118 at 119.]

The broad question in issue here is whether the container deposits forfeited to the plaintiff are entitled to the preferential treatment of section 117 of the 1939 Code, as amended, 26 U.S.C. § 117 (1952 ed.), particularly subsections (j) (1) and (j) (2), which are as follows:

> "(j) (1) For the purposes of this subsection, the term 'property used in the trade of business' means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23(l), held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not (A) property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of the taxable year, or (B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, * *.

> "(j) (2) If, during the taxable year, the recognized gains upon sales or exchanges of property used in the trade or business, plus the recognized gains from the compulsory or involuntary conversion (as a result of destruction in whole or in part, theft or seizure, or an exercise of the power of requisition or condemnation or the threat or imminence thereof) of property used in the trade or business and capital assets held for more than 6 months into other property or money, exceed the recognized losses from such sales, exchanges, and conversions, such gains

and losses shall be considered as gains and losses from sales or exchanges of capital assets held for more than 6 months. * * * "

In order for the plaintiff to come within the provisions of section 117(j) the burden is upon it to show: (1) that the cylinders were used in the trade or business; (2) were subject to an allowance for depreciation; (3) were held for more than 6 months; (4) were not included in inventory if on hand at the close of the taxable year; (5) were not held by the plaintiff primarily for sale to customers in the ordinary course of its trade or business; and (6) that the disposition of the cylinders was by "involuntary conversion," "sales," or "exchanges." In the brief filed on behalf of the Government it is admitted that the plaintiff has established the first four of these requirements. The Government contends, alternatively, that the plaintiff held the cylinders primarily for sale to customers in the ordinary course of its trade and business, or that the disposition of the cylinders was not by "involuntary conversion," "sale," or "exchange."

■ The classification of an asset as "held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business" may involve a number of subsidiary decisions. Here, however, there is no question that the plaintiff is engaged in a trade or business, or that the *disposition* of the cylinders occurred in the ordinary course of that business. But were the cylinders held for sale? The cylinders were not products which the plaintiff manufactured and inventoried. They were required equipment for the sale and delivery of plaintiff's refrigerant gas products as tanks, trucks, and railroad tank cars were required for the sale and delivery of other products. Plaintiff always treated the cylinders as delivery equipment and as permanent capital investments in its refrigerant-gas manufacturing plants. The stipulations show that plaintiff did not advertise for sale or in any manner try to promote the sale of these cylinders.

Indeed, it appears that the plaintiff took reasonable steps to insure that the cylinders, released to the possession of its customers, would be returned. We think it must be concluded that the cylinders were not held for sale. Cf. S. E. C. Corporation v. United States, D.C.S.D.N.Y. 1956, 140 F.Supp. 717, affirmed per curiam, 2 Cir., 1957, 241 F.2d 416; United States v. Massey Motors, Inc., 5 Cir., 1959, 264 F.2d 552; Philber Equipment Corp. v. Commissioner, 3 Cir., 1956, 237 F.2d 129.

The particular statutory requirement of "sale or exchange" has existed since 1921 when capital gains provisions were first inserted into the income tax structure. Despite this history, complications arise in applying the phrase "sale or exchange" to the myriad transactions that occur in our free and remarkably flexible economy. The transactions before us now are normal commercial practices. These are not "legal paraphernalia which inventive genius may construct as a refuge" from taxes. Helvering v. Clifford, 1940, 309 U.S. 331, 60 S.Ct. 554, 556, 84 L.Ed. 788. Nevertheless, the transactions are difficult to sort into classic, academic pigeonholes such as sales, consignments, and conversions. We belive, however, that whatever the outer boundaries established by "sale or exchange" and "involuntary conversion" the transactions here are certainly included.

The facts of this case are clearly distinguishable from those in Nehi Beverage Co. v. Commissioner, 1951, 16 T.C. 1114, on which the Government relies. That case involved soft drink bottles in which the deposits were held to be ordinary income to the manufacturer when customers failed to return the bottles. It was the stated theory of that case that bottles which were not returned had been broken or destroyed and were no longer in anyone's hands; and since no property existed there could have been no transfer of property, and that the proceeds from the destroyed bottles could not be traced into payments for any new bottles.

This is an entirely different case. These were steel cylinders that were designed for a particular purpose, and were required to be inspected because of the condensed chemical commodity which they held under pressure. The cylinders involved were of great weight and strength. They were extremely durable and had a useful life of many years. Undoubtedly, when the plaintiff appropriated the deposits to its general income account the cylinders were still in existence. Clearly, they were not held for sale in the ordinary course of business but were essential to the shipment of the refrigerant commodity. The fact that the plaintiff waited 2 or 3 years before taking down the deposit rather than exercising its privilege at the end of 90 days is rather strong evidence that plaintiff preferred return of the cylinders rather than holding them for sale in the regular course of business.

The cylinders were not manufactured by the plaintiff; they were purchased to meet the commercial necessities of the parties. It manifestly preferred not to sell them but to guard against the necessity of replacement.

There is one further point which the Government raises. The Supreme Court has determined that the classification of assets as capital or noncapital may in some instances be governed by a standard other than the statutory definition taken literally. Assets not held for sale in the ordinary course of business in the usual statutory sense may nevertheless be classified as noncapital when an integral part of the business itself. Corn Products Refining Co. v. Commissioner, 1955, 350 U.S. 46, 52, 76 S.Ct. 20, 100 L.Ed. 29. Prior to the Supreme Court decision in Corn Products the lower courts and the Commissioner had in certain situations applied a similar principle by means of which assets such as corporate stocks and bonds were in effect classified as noncapital under exceptions to the definition of a capital asset not contained in § 117 (a) of the statute. G.C.C. 17322, 1936-2 Cum.Bull. 151; Commissioner of Internal Revenue v. Bagley & Sewall Co., 2 Cir., 1955, 221 F.2d 944; Tulane Hardwood Lumber Co., Inc. v. Commissioner, 1955, 24 T.C. 1146; Western Wine & Liquor Co. v. Commissioner, 1952, 18 T.C. 1090.

■ These cases before and after Corn Products have all dealt with assets defined in § 117(a) of the 1939 Code or its successor, § 1221 of the 1954 Code, 26 U.S.C. § 1221. In Rev.Rul. 58-77, 1958-1 Cum.Bull. 118, the Commissioner extended the Corn Products rule to assets of the § 117(j) variety (so-called § 1231 assets under the 1954 Code), as the depreciable containers in the case before us now. The Government urges that the ruling was correct and the gain from the disposition of the cylinders should be judged as [350 U.S. 46, 76 S.Ct. 24] "arising from the everyday operation of the business" and so taxed as ordinary income. No case has been cited to us where the rule in Corn Products has been extended to property under § 117(j) of the Code. It may be that gain from the disposition of property used in the trade or business may be so closely allied to the main sources of business income that Corn Products may be properly applied. We do not think it would be an appropriate application in this case.

The determining factor is the purpose for which the property was held at the time of its acquisition and during its period of use; the nature of the commodity, its weight, its practically indestructible quality and the circumstances surrounding its use and disposition. In the light of these undisputed facts, the proceeds from the disposition of the unreturned cylinders should be treated as capital gains rather than as ordinary income.

The second part of this case deals with plaintiff's disclosure of a secret process and the treatment of income received in exchange. The plaintiff developed an electrolytic process for producing the metal sodium. The process was at first thought not to be patentable and was kept secret. However, the process was put into commercial use by the plaintiff. In

1948, Associated Ethyl Corporation, Ltd., a British corporation (hereafter referred to as Associated) sought to obtain plaintiff's secret process. On May 15, 1950, a written contract was made whereby plaintiff agreed to transfer the complete blueprints and operational characteristics of the process to Associated in consideration of the sum of $225,000. In addition, the plaintiff promised "not to assert against [Associated] any patent covering the construction or use of sodium cells, the licensing rights of which were possessed by du Pont." Associated agreed to keep the process secret for 5 years. No restrictions were placed on plaintiff's right to disclose the process. The contract placed no restrictions on Associated's use of the process anywhere in the world.

On December 18, 1950, plaintiff agreed to grant similar rights to the electrolytic cell to the Ethyl Corporation, a Delaware corporation, in exchange for $400,000.

In 1952, patents did issue both in the United States and in Great Britain covering certain functional features of the electrolytic cells.

For the purposes of this case the Government concedes that the secret process was "property" within the meaning of section 117(a) of the Internal Revenue Code; that plaintiff was not in the business of selling secret processes, and that this particular secret process was not held primarily for sale to customers in the ordinary course of trade or business.

In dispute is the question whether the disclosure of the secret process in exchange for $225,000 constituted a "sale" of the process within the meaning of section 117. Only if there was a sale is plaintiff entitled to preferential capital treatment of the gain realized on the transaction. Plaintiff maintains that merely having disclosed its secret process to another, it is somehow poorer; something has been irretrievably given away; that since money was received in exchange for this something given away, a sale of property must have occurred.

The propriety of classifying confidential disclosures of ideas as dealings in property has been under discussion in this country since the time of Jefferson, who stated:

"If nature has made any one thing less susceptible than others of exclusive property, it is the action of the thinking power called an idea, * * *. Its peculiar character, too, is that no one possesses the less because every other possesses the whole of it. He who receives an idea from me receives instruction himself without lessening mine; as he who lights his taper at mine, receives light without darkening me." [Writings of Thomas Jefferson, Vol. 6, pp. 180–181, H. A. Washington ed. (1854).]

Justice Holmes, in an injunction proceeding to prevent a former employee of plaintiff from disclosing secret processes which he had learned while in plaintiff's employ, in Du Pont de Nemours Powder Co. v. Masland, 1917, 244 U.S. 100, 102, 37 S.Ct. 575, 576, 61 L.Ed. 1016, made the following statement:

"Whether the plaintiffs have any valuable secret or not the defendant knows the facts, whatever they are, through a special confidence that he accepted. The property may be denied but the confidence cannot be. Therefore the starting point for the present matter is not property or due process of law, but that the defendant stood in confidential relations with the plaintiffs, or one of them.

We quote from Judge Learned Hand, in Cheney Bros. v. Doris Silk Corporation, 2 Cir., 1929, 35 F.2d 279, 280, the following:

" * * * a man's property [in an idea] is limited to the chattels which embody his invention."

See also Fowle v. Park, 1889, 131 U.S. 88, 9 S.Ct. 658, 33 L.Ed. 67; Nelson v. Commissioner, 6 Cir., 1953, 203 F.2d 1; Huckins v. United States, D.C.Fla. April 1, 1960, 5 A.F.T.R.2d 1222.

Were we to accept plaintiff's position without qualification, it would be similar to concluding that a lawyer makes a sale of property when he discloses an estate plan to a client, and a doctor makes a sale when he discloses the diagnosis of his patient's ills. Cf. Regenstein v. Commissioner, 1960, 35 T.C. 183.

In another light, however, the transfer of a trade secret may be a transaction equivalent to a sale, in the same manner that a patent assignment is considered a sale. In each case the transferee or assignee gets more than mere information. Of greater importance, he obtains what he believes to be a competitive advantage, a means for commercial exploitation and reward.

Without question, there are important differences between patents and trade secrets. Under the Constitution a patent secures to the inventor the exclusive rights to his discovery. A form of monopoly is given in exchange for the full disclosure and public dedication of a new and useful invention. United States v. Dubilier Condenser Corp., 1933, 289 U.S. 178, 77 S.Ct. 513, 77 L.Ed. 1114. Information contained in a patent is public, widely distributed, and generally known by those interested in a particular art. Inevitably the patented idea becomes common knowledge, yet the patentee retains the right to prevent the manufacture, use and sale of the invention during the life of the patent. 35 U.S.C. § 154. The patent owner may affirmatively act to prevent anyone else from using the patented invention; even to prevent such use by a second inventor who discovers the same idea entirely on his own. It follows that no disposition of a patent is complete without some transfer of this right to prevent infringement.

A trade secret is any information not generally known in a trade. It may be an unpatented invention, a formula, pattern, machine, process, customer list, customer credit list, or even news. The information is frequently in the public domain. Anyone is at liberty to discover a particular trade secret by any fair means, as by experimentation or by examination and analysis of a particular product. Moreover, upon discovery the idea may be used with impunity. A plurality of individual discoverers may have protectible, wholly separate rights in the same trade secret. However, the owner of a trade secret has no protectible rights in the *idea* itself any more than a lawyer has in his estate plan or a doctor in his diagnosis. Unlike an estate plan or a diagnosis, a trade secret, as a tool for commercial competition, derives much of its value from the fact of its secrecy. It is truly valuable only so long as it is a secret, for only so long does it provide an advantage over competitors. It follows that the essential element of a trade secret which permits of ownership and which distinguishes it from other forms of ideas is the right in the discoverer to prevent unauthorized disclosure of the secret. No disposition of a trade secret is complete without some transfer of this right to prevent unauthorized disclosure.

However different these concepts of trade secrets and patents may appear to be, there is an important similarity; they are both means to competitive advantage. The value in both lies in the rights they give to their owners for monopolistic exploitation. The owner of a patent can make something which no one else can make because no one else is permitted. But circumstances are frequently such that the owner of a trade secret can make something which no one else can make because no one else knows how. The patent owner has a monopoly created by law; the trade secret owner has a monopoly in fact. In both cases there exists the possibility of either limited or complete transfers of the right to the exclusive use of an idea.

A person may pay the owner of a patent for the privilege of operating under the patent without liability for infringement. This is the simple license situation. De Forest Radio T. & T. Co. v. United States, 1927, 273 U.S. 236, 47 S.Ct. 366, 71 L.Ed. 625, and is not considered a "sale" under the tax law.

Parke, Davis & Co. v. Commissioner, 1934, 31 B.T.A. 427; Edward C. Myers v. Commissioner, 1946, 6 T.C. 258. Again, a person may pay the owner of a patent for the privilege of operating under the patent without liability for infringement, and in addition may pay for the residual right possessed by the patent owner, that being the right to prevent all others from operating under the patent. This is an assignment, Waterman v. Mackenzie, 1891, 138 U.S. 252, 11 S.Ct. 334, 34 L.Ed. 923; Paulus v. M. M. Buck Mfg. Co., 8 Cir., 1904, 129 F. 594, and is treated as a "sale" under the tax law. Edward C. Myers, supra; Commissioner of Internal Revenue v. Hopkinson, 2 Cir., 1942, 126 F.2d 406. In both cases there has been a sacrifice of an exclusive market and the establishment of a potential competitor where formerly the law guaranteed there would be none. Yet unquestionably the money received from the license is ordinary income to the owner of the patent, while the money received from the assignment may be treated as capital gain.

Compare the situation which obtains with trade secrets. A person may pay the discoverer of a trade secret for its disclosure, but in fact the disclosure which is purchased carries with it the right to use the trade secret without liability to the owner. This is the instant case. Again, a person may pay the discoverer of a trade secret for disclosure (i. e., the privilege of using the trade secret) and in addition pay for the residual right possessed by the discoverer— the right to prevent unauthorized disclosure. And this right to prevent unauthorized disclosure is effectively as stated above, the right to prevent anyone else from using the secret process. This is the situation in the Nelson and Huckins cases, supra.

■■■ Just as the grant of the naked right to operate under a patent in exchange for money results in ordinary income to the owner of the patent, so the simple disclosure and grant of the privilege of using a trade secret in exchange for money must also result in ordinary income to the discoverer of the trade secret. In both instances there has been no disposition of interest sufficient to meet the "sale" requirement of the Code Cf. Commissioner of Internal Revenue v. P. G. Lake, Inc., 1958, 356 U.S. 260, 78 S.Ct. 691, 2 L.Ed.2d 743; Leubsdorf v. United States, 1958, 164 F.Supp. 234, 143 Ct.Cl. 165; Cleveland Graphite Bronze Co. v. Commissioner, 1948, 10 T.C. 974.[1] When a patent owner gives not only the right to operate under the patent but in addition conveys all or a part of his remaining rights in the patent (particularly the right to exclude others from using the idea) in exchange for money, the disposition is complete. The transaction satisfies the "sale" requirement of the Code, and any gain on the transaction may be entitled to capital treatment. Similarly, when the owner of a trade secret gives the right to use the secret and in addition conveys his most important remaining right. the right to prevent unauthorized disclosure (and effectively the right to prevent further use of the trade secret by others) there is a complete disposition of the trade secret. This transaction meets the "sale" requirement of the Code and any gain would be entitled to preferential capital treatment.

■ In the case before us the plaintiff did not transfer to Associated the right to prevent further disclosure of the secret process. In fact, Associated could do nothing to prevent the subsequent disclosure of the secret by plaintiff to Ethyl of Delaware. Because of this, we find that the disposition of the trade secret did not meet the requirements of a "sale." Accordingly, the gain realized on the transaction must be taxed as ordinary income. Any other rule would encourage tax avoidance by providing a broad ave-

[1]. See Creed and Banks, "Know-How" Licensing and Capital Gains, 4 Patent, Trademark and Copyright J. Research and Education 93 (1960).

nue for the conversion of ordinary royalty income into capital gain.

The plaintiff has cited two English cases in support of its position: Evans Medical Supplies, Ltd. v. Moriarty, 1959, 37 Tax Cases 540, and Jeffrey v. Rolls-Royce, Ltd., 1960, 1 Weekly Law Reports 720. We believe these cases may be distinguished from the case at bar. In both of the English cases the central issue was whether the disclosure of a trade secret occurred in the ordinary course of the taxpayer's trade. Furthermore, it does not appear from these cases that English tax law distinguishes between income from the sale and income from the license of a capital asset, as does our own law.

 The third element of this case concerns certain shares of plaintiff's common stock which plaintiff purchased for the specific purpose of giving to its employees as bonuses. The shares appreciated in value between the time of purchase and the time of delivery to the employees. In filing its tax return for 1950 plaintiff noted the difference in purchase price and market price at time of delivery as realized capital gain and paid a tax accordingly. Plaintiff now claims a refund of this amount. Defendant concedes the point on the basis of our decision in Hercules Powder Co. v. United States, Ct.Cl., 180 F.Supp. 363.

The plaintiff is entitled to recover on the first and third claims, and is denied recovery on the second claim. Judgment will be entered to that effect. The amount of recovery will be determined pursuant to Rule 38(c), 28 U.S.C.A.

It is so ordered.

DURFEE, LARAMORE, and MADDEN, Judges, concur.

FAHY, Circuit Judge, sitting by designation, agrees with the disposition made by the court of the second and third claims, but he does not agree that plaintiff is entitled to recover on the first claim, being of the view that there was no sale of the cylinders.