PHILADELPHIA QUARTZ COMPANY

v.

The UNITED STATES.

PHILADELPHIA QUARTZ COMPANY
OF CALIFORNIA

v.

The UNITED STATES.

Nos. 404–64, 421–64.

United States Court of Claims.

March 17, 1967.

William R. Reynolds, Philadelphia, Pa., attorney of record, for plaintiffs. Michael F. Beausang, Jr., and MacCoy, Evans & Lewis, Philadelphia, Pa., of counsel.

E. Alan Moorhouse, Washington, D. C., with whom was Asst. Atty. Gen. Mitchell Rogovin, for defendant. Lyle M. Turner and Philip R. Miller, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

OPINION

LARAMORE, Judge.

These claims [1] put in issue the character of income resulting from the forfeiture of deposits on returnable steel drums used for the shipment of industrial chemicals. Plaintiffs assert the income is capital gain from the sale, exchange, or involuntary conversion of business assets under section 1231 of the Internal Revenue Code of 1954 under this court's holding in E. I. DuPont De Nemours & Co. v. United States, 288 F. 2d 904, 153 Ct.Cl. 274 (1961). The defendant contends these actions do not fall within the compass of the *DuPont* holding because of factual distinctions, and that the governing authority is Corn Products Refining Co. v. Commissioner of Internal Revenue, 350 U.S. 46, 76 S.Ct. 20, 100 L.Ed. 29 (1955), which would deny favorable "1231" treatment.

1. Plaintiff in Case No. 404–64 is the Philadelphia Quartz Company. Plaintiff in Case No. 421–64 is the Philadelphia Quartz Company of California. The actions have been consolidated.

Alternatively, defendant argues plaintiffs have failed to show the sale, exchange, or involuntary conversion required for capital gain treatment. We think that the facts in the present actions present the same legal issue as those in *DuPont*, and that the reasoning of that opinion applies with equal force here. In the present opinion, we do no more than readopt the reasoning of that case.

The facts have been stipulated. During the tax years before us, the Philadelphia Quartz Company (plaintiff in Case No. 404–64) shipped chemical products in returnable steel drums to those customers who required less than tank car or tank truck lots. These drums, which were roughly three feet long and two feet in diameter, were manufactured of 14-gauge steel by the Jones & Laughlin Steel Corporation; they had a 55-gallon capacity and weighed from 550 to 745 pounds when filled. Each drum bore the following legend in raised letters on its head or on an attached brass tag: "Philadelphia Quartz Co. owns this drum. It is never sold." Consistent with this, the invoices relating to the shipment of chemicals in the drum showed a separate billing item: "returnable drums—deposit of $15.00 each," and had the same statement that was embossed on the drum or the attached brass tag with the additional information: "Conditions and certification on back hereof are part of this invoice." The back of the invoice contained the following information:

RETURNABLE DRUM TERMS

These conditions are part of each invoice bearing a returnable drum charge.

The drums for which a deposit charge is made remain the property of Philadelphia Quartz Company. The deposit charge is subject to refund as outlined by conditions below.

I. *Identification—*

A. Drum head embossed and/or brass tag attached—"Philadelphia Quartz Co. owns this drum. It is never sold."

\* \* \* \* \* \*

II. *Charge—*

A. $15.00 each [$10.00 in some instances], payable "net cash in 30 days from date of invoice."

\* \* \* \* \* \*

C. Payment of deposit does not cancel conditions below.

III. *Credit—*

\* \* \* \* \* \*

B. Following receipt of drum in good condition within one year from date of shipment.

\* \* \* \* \* \*

D. Refund checks are issued monthly.

The other document attending each transaction was the sales agreement which provided:

Returnable drums shall remain the property of Seller [plaintiff]. At the time of each shipment Buyer agrees to pay Seller's deposit charge then in effect and to return the drums to Seller promptly as emptied with freight prepaid by Buyer. Seller agrees to credit Buyer with the amount of such deposit charge on drums returned within one year if received in good condition at Seller's plant from which shipped.

The primary purpose of this arrangement was to secure return of the drums. This may be inferred from a number of factors. First, the amounts of the required deposits were significantly higher than the costs of the drums. The drums for which a $10 deposit was required cost $6.77 on average; those requiring a $15 deposit cost $7.51 on average. Although the stipulation does not so state, it seems apparent that chemical buyers wanting drums could buy them for less, though perhaps not at the same (presumably) low bulk rate paid by Philadelphia Quartz Company to Jones & Laughlin. This proposition assumes greater force when the depreciable character of the drums is considered. These drums were constantly reused and had an average

life of 6⅔ years for tax purposes. Assuming the depreciable life of the drums was related to reality, it is evident that older drums were worth less than newer, making the "cost-deposit" differential even greater on older drums. In short, a drum "purchased" by forfeiture of the deposit was no bargain. Second, the value of the drums was substantial in relation to the value of the chemicals shipped in them. Philadelphia Quartz Company shipped three grades of material in these drums, the low priced averaging $10.70 per drum, medium priced $18.31 per drum, and high priced $41.53 per drum, respectively. Third, it has been stipulated that the returnable drum system, to the extent it succeeded, enabled the company to avoid the administrative burden of continually purchasing, stocking and accounting for drums. Fourth, the stipulation shows that most customers returned the drums and that the company gave credits even for late returns.

For the taxable year 1957, the Philadelphia Quartz Company included in its taxable income one-fourth of the amount carried on its books as of December 31, 1954, as the liability for unreturned deposits. (The other three-fourths had been previously included in income in the preceding three years.) From 1958 through 1960, a different system was used; the annual excess of drums shipped over drums returned was averaged for the prior seven years, and the resulting average for one year was multiplied by the $15 deposit amount to produce an income figure. There is apparently no question that this method of estimating the current year's income from forfeited deposits was permissible in this case. The amounts claimed as overpayments for 1957 through 1960 are in each instance the difference between the 52 percent tax paid on the income and the 25 percent capital gains rate.

The facts stipulated by Philadelphia Quartz Company of California (plaintiff in Case No. 421–64) and the defendant are almost identical. The invoices, although different, were equally clear in specifying that the drums were the property of the company and returnable. Also different was the cost of the drums, but although higher, it was less than the deposit price. The other differences are of still less significance. The claims for refund relate to the taxable years 1958 through 1960. The method of computing the income for 1958 was identical to that used by the other plaintiff for its taxable year 1957. For 1959, the earlier described averaging method was used to compute the income from the forfeited deposits, and for 1960, since the seven year average showed an excess of returns over shipments, the income was computed by reducing the deposit liability to inactive accounts.

The DuPont case also involved returnable containers for industrial chemicals and a similar deposit system. The sales documents there, like those here, specified that the seller owned the containers and that the deposit would be returned upon receipt of the container. The deposit amount was significantly above cost, and the practice was to refund deposits even when containers were received after the expiration of the specified time. 288 F.2d, at 906, 153 Ct. Cl., at 278. This is also the case here. The issue was whether the income from the forfeitures qualified for capital gain treatment under section 117(j) of the Internal Revenue Code of 1939. The defendant admitted that four of the provision's six requirements had been satisfied. Thus, it was beyond dispute that *DuPont's* cylinders (1) were used in the trade or business, (2) were subject to an allowance for depreciation, (3) were held for more than six months, and (4) were not included in inventory if on hand at the close of the taxable year. The dispute was over the provision's other requirements—i. e., (5) that the cylinders not be held by the taxpayer primarily for sale to customers in the ordinary course of its trade or business and (6) that the disposition of the cylinders be by sale, exchange, or involuntary conversion. 288 F.2d, at 908, 153 Ct.Cl., at 280–281.

In the present actions, section 1231 of the 1954 Code is applicable; it is the successor to section 117(j) and is substantially identical. The defendant here does not contend that the drums were held primarily for sale to customers as it did in *DuPont*. This court put that issue to rest in *DuPont*, 288 F.2d, at 908, 153 Ct.Cl., at 281; any remaining doubts must have been resolved by Malat v. Riddell, 383 U.S. 569, 86 S.Ct. 1030, 16 L.Ed. 2d 102 (1966). The defendant urges instead that *DuPont* may be distinguished as involving more substantial equipment, and that *DuPont* should be re-examined in the light of recent developments in the so-called *Corn Products* rule. We have already indicated that we do not see significant factual distinctions between the present case and *DuPont*. Nor do we think alleged recent developments in the *Corn Products* rule change what this court said about that rule in *DuPont*.

In *DuPont*, the court observed that the cases before and after *Corn Products* all dealt with so-called section 1221 assets. 288 F.2d, at 909, 153 Ct.Cl., at 283. The sole authority for extending the rule to section 1231 assets was the Commissioner's own revenue ruling. Rev.Rul. 58-77, 1958-1 Cum.Bull. 118. The only recent authority cited by defendant for its theory is United States v. Hess, 341 F.2d 444 (10th Cir.1965), in which the Tenth Circuit, in reviewing a trial court's jury charge, assumed that *Corn Products* could apply to 1231 assets. Id., at 447. The other cases cited simply do not prove defendant's point. Malat v. Riddell, supra, 383 U.S. at 572, 86 S.Ct. 1030; Recordak Corp. v. United States, 325 F. 2d 460, 462, 163 Ct.Cl. 294, 298 (1963); Booth Newspapers Inc. v. United States, 303 F.2d 916, 920, 157 Ct.Cl. 886, 894 (1962). This is a potentially troublesome area which need not be disturbed now if it is determined that the *Corn Products* theory does not apply to the facts of these actions. We do not think it does, so we expressly reserve decision on the applicability of the *Corn Products* rule to section 1231 assets.

■ To us, the essence of the *Corn Products* decision is that transactions integral to or at the core of a business will occasion ordinary income treatment because of Congress' intent "that profits and losses arising from the everyday operation of a business be considered as ordinary income or loss rather than capital gain or loss." 350 U.S., at 52, 76 S.Ct., at 24. There, the Court held that profits from the sale of corn futures were ordinary income and outside section 1221 because the taxpayer regularly traded futures to assure a supply of corn at competitive prices for its processing business. The present facts are quite dissimilar. In no sense is the income from forfeited deposits integral to or at the core of plaintiffs' chemical business-es in the fashion that the Corn Products Company's futures trading was intimately connected to its entire raw material supply operations. Surely taxpayers can be in multiple trades or businesses, and plaintiffs could be in the drum sales business as well as the chemicals business. But that is not the case. The defendant has not contended that plaintiffs held the tanks primarily for sale to customers under section 1231(b) (1) (B); this would seem to be a prerequisite for being in the drum business.

■ It is true that there is language in *Corn Products* which has an apparently broad sweep: "The preferential treatment provided by § 117 [the predecessor to *both* sections 1221 and 1231 of the 1954 Code] applies to transactions in property which are not the normal source of business income." Id., at 52, 86 S.Ct. at 24. And there is no doubt that in the present case, the income was regular and statistically foreseeable. We are of the view, however, that mere recurrence of income is not the test. Contra, 75 Harv.L.Rev. 845, 847 (1962). In this connection, the practices of the leasing industry are instructive. Car rental companies regularly dispose of their equipment after a relatively short period of use. Before the useful life and salvage value issues relating to depreciation were settled in the cases cited below,

it was very common for car rental companies to have substantial and regular income from car sales. The gains resulted from the industry practice of taking the greatest and fastest depreciation deductions possible. The used cars typically had an adjusted basis below the used car sales price. These cars were section 1231 assets, and it was simply assumed that the income on their sale was taxable at the 25 percent rate. See Massey Motors, Inc. v. United States, 364 U.S. 92, 97, 80 S.Ct. 1411, 4 L.Ed.2d 1592 (1960); Hertz Corp. v. United States, 364 U.S. 122, 80 S.Ct. 1420, 4 L.Ed.2d 1603 (1960).

In the alternative, defendant argues there was no sale, exchange, or involuntary conversion necessary for section 1231 treatment. The gist of this argument is that all the documents and the drums themselves stated the drums were not for sale. In addition, "sales" law would not recognize plaintiffs' accounting acts as sales. A similar argument was made by the government in *DuPont*, 288 F.2d, at 908–909, 153 Ct.Cl., at 281–282, there based on Nehi Beverage Co., 16 T.C. 1114 (1951). In that case, the Tax Court held there was no sale, exchange, or involuntary conversion of unreturned pop bottles because they were presumably destroyed and in no sense transferred or converted. This court distinguished duPont's steel cylinders from pop bottles, noting that at the time duPont credited its income accounts with the forfeited deposits, the cylinders were undoubtedly still in existence and being used. The present case presents no new aspect. We reaffirm this part of *DuPont* with two more precise observations. First, we note that one requirement of a sale or exchange was met in the transfer of the drums for a valuable consideration—albeit on a forfeitable deposit or conditional basis. Second, it would seem possible for the cancellation of the liability to the depositor, after expiration of the time for forfeiture, to constitute a sale or exchange. See 75 Harv.L.Rev. 845, 846 (1962), and cases cited thereat.

In conclusion, we hold that the income from these forfeited deposits is entitled to capital gain treatment under section 1231, and that plaintiffs are, accordingly, entitled to recover. The amounts of recovery will be determined pursuant to rule 47(c) (2) of the Rules of this court.