ZOTOS INTERNATIONAL,
INC., Plaintiff,

v.

Donald KENNEDY, Commissioner, Food
& Drug Administration, et al.,
Defendants.

Civ. A. No. 77–0218.

United States District Court,
District of Columbia.

April 27, 1978.

William I. Althen, Washington, D. C., for plaintiff.

William H. Briggs, Jr., Asst. U. S. Atty., Washington, D. C., for defendants.

## OPINION

JUNE L. GREEN, District Judge.

The parties in this case have filed cross motions for summary judgment with regard to Count II of the complaint. The Court grants summary judgment to plaintiff for the reasons stated below.

### I.

The material facts relating to Count II are not disputed. Plaintiff Zotos International, Inc. engages in the manufacture and sale of certain cosmetic products regulated by the Food and Drug Administration (FDA), which, together with two of its officials, is a defendant in this case.

Section 5 of the Fair Packaging and Labeling Act, 15 U.S.C. § 1454, provides that whenever the Secretary of Health, Educa-

tion and Welfare determines with respect to consumer cosmetics that additional regulations are needed to prevent the deception of consumers or to facilitate value comparisons, he may promulgate such regulations to

> (3) require that each label on each package of a consumer commodity . . bear (A) the common or usual name of such consumer commodity, if any, and (B) in case such consumer commodity consists of two or more ingredients, the common or usual name of each such ingredient listed in order of decreasing predominance, but *nothing in this paragraph shall be deemed to require that any trade secret be divulged.* (Emphasis added.)

The Secretary has delegated to the FDA the authority to administer the Act with regard to food, drugs and cosmetics. After a lengthy rulemaking process which began in 1973 and culminated in 1975, the agency issued regulations requiring that the ingredients of consumer cosmetics be listed on the label accompanying the products. The regulations, now codified at 21 C.F.R. § 701.3, provide in part:

> Where one or more ingredients is accepted by the Food and Drug Administration as exempt from public disclosure pursuant to the procedure established in § 720.8 of this chapter, in lieu of label declaration of identity, the phrase "and other ingredients" may be used at the end of the ingredient declaration.

On May 17, 1976, Zotos filed a letter with the FDA claiming trade secret status for a product formed by the reaction of two chemicals and used in certain cosmetics marketed by the company. "To the best of our knowledge," a Zotos official stated, the product "cannot be purchased on the open market nor is it listed in rare chemical catalogs."

On June 2, the FDA informed Zotos that the petition had provided "only qualitative information" on the ingredient's chemical composition, and that "[a] semi-quantitative formulation is needed for the FDA to evaluate your request against what may be found in a literature search." Zotos provided the formula in a letter dated June 15.

The next communication between the parties occurred on December 23, 1976, when the agency notified Zotos that "the identities of the two ingredients cannot be accepted as confidential information . . ."

The FDA stated that the first ingredient of the two employed to form the disputed substance was a "much-referenced" agent "widely used" in hair products. The agency cited five publications in support of its statement, and added that the first ingredient's "use in hair products is recommended in the trade literature of many raw material suppliers."

As for the second ingredient, the FDA named three publications and a patent in which it was said to be described.

The agency then stated that the concept of using the two ingredients in combination "is not new," citing three patents alleged to substantiate this conclusion. The FDA also identified a publication in German as additional support.

The FDA concluded by stating that its determination constituted "final agency action," and, consequently, that disclosure of the ingredient would be required unless the decision were challenged in court within ten days, in which case the FDA would continue to keep the information in its possession confidential until the court ruled.

The FDA's December 23 letter was received by Zotos on December 29, and on that date the ten-day period began to run. On January 4, 1977, Zotos hand-delivered a letter to the agency stating that it intended to move for "formal reconsideration" of the agency's determination. Preparation of the motion, Zotos wrote, would require not only an additional description of evidence tending to substantiate Zotos' claim but also a "detailed review" of the countervailing materials cited in the agency's December 23 letter. Zotos requested, therefore, that the FDA stay the January 9 deadline for filing suit pending its review of the motion, so that the company would not have to embark immediately on a court challenge in

order to take advantage of its right to judicial review.

On the same date—January 4—Zotos requested by telephone that the agency supply copies of the documents cited in its December 23 letter. On January 5 the FDA made available two American patents and the article written in German, all of which had been cited by the agency as bases for its conclusion that the use in combination of the two basic ingredients did not merit trade secret protection. The FDA wrote that it did not have a copy of the fourth authority on which this conclusion had been based—a French patent—but instead had learned of the nature of the patent from secondary sources, the citations for which were provided.

On January 7, the agency responded to the January 4 letter which had requested the stay pending submission of a formal petition for reconsideration. The FDA stated in part:

We intend to allow you an additional 30 days from today, i. e., until February 7, 1977, during which the Agency will not take regulatory action with respect to the cosmetic ingredient labeling requirements for this particular ingredient. This extension will allow you time to evaluate the references cited in the Agency's determination. We understand you do not have ready access to the materials cited and that this has made it more difficult for you to decide your course of action.

At the end of this 30 day time-period, if you have commenced a lawsuit . . . , the Agency will not take regulatory action . . . . The Agency's December 29, 1977 letter (sic) constitutes a final Agency determination.

Zotos submitted its formal petition for reconsideration, and a motion for a further stay of regulatory action, on January 31. The petition discussed in scientific detail the references relied upon by the FDA. It claimed that the patents and publications involved described the combinative use of chemicals whose compositions were similar, but not identical, to those of the chemicals employed by Zotos, and that the substances produced did not have the beneficial effects which the company's trade secret had. Attached to the petition was an affidavit of a Senior Vice President of Zotos which presented a history of the firm's efforts to develop the substance and a further discussion of its composition and traits. The affidavit stated in part:

FDA's letter states that knowledge of the two starting chemicals were known and that the concept of reacting [the first type of ingredient] with [the second type of ingredient] for achieving improved hair conditioning action was known.

Even assuming that this concept was established when we started our experimentation (which it was not), we submit that it would require literally thousands of experimentations to try each [of the ingredients of the first type] with a single [ingredient of the second type] and vice-versa and then do the required testing to determine its suitability in a cosmetic product.

On February 3, counsel for Zotos was informed by telephone that the January 31 motion for a further stay was denied. Consequently, on February 7, Zotos filed this action in order to meet the February 8 deadline for instituting suit and preserving the confidentiality of its substance pending the outcome of litigation.

On March 22, the FDA wrote Zotos a letter which read in part:

This letter is in response to the petition for reconsideration . . . you forwarded . . . on January 31, 1977.

We have reviewed the data and information provided as attachments and reconsidered your petition. We must reaffirm our earlier conclusion that the information for which you requested exemption from public disclosure cannot be accepted in confidence for the reasons stated in our letter of denial of December 23, 1976. The petition has failed to convince us that relevant data, information or views contained in the administrative record were not adequately covered. It merely restates the same grounds in the original request for exemption from public disclosure.

The letter went on to repeat, in a paragraph, that the two constituent ingredients were familiar in cosmetics and that the concept of reacting the first type of ingredient with the second type of ingredient to produce a material with improved hair conditioning and other cosmetic properties was well known.

On April 11, 1977, defendants moved to dismiss Count II of the complaint on the ground that it fails to state a claim upon which relief can be granted. Count II alleges, in substance, that the procedures used to evaluate Zotos' trade secret claim fall short of the requirements of the Due Process Clause of the Fifth Amendment.[1]

On May 13, Zotos filed its opposition to defendants' motion and moved for summary judgment. The Court heard oral argument on the motion to dismiss on January 16, 1978. At the conclusion, the Court indicated that it wished to consider matters outside plaintiff's original pleading and asked defendants to file for summary judgment.

Defendants complied on January 27. In their statement of uncontested material facts, they agreed with plaintiff's allegation that the FDA had not given notice, prior to its "final" action on December 23, 1976, of the references upon which it relied in denying the trade secret request, and that Zotos had not discussed these references itself in any filings prior to the December 23 decision.

## II.

Plaintiff argues that due process requires, and the procedure used denied, an opportunity prior to a final determination to examine any adverse evidence in defendants' possession, comment upon or respond to such evidence, receive notice of any tentative or proposed adverse decision, or otherwise rebut material considered by the FDA to run counter to the trade secret claim.

Before the specific requirements of due process in this situation may be examined, the Court must confront a more fundamental question—whether a claim of trade secret status is a claim of a property interest deserving of due process protection.

A trade secret "may consist of any formula, pattern, device or compilation of information which is used in one's business and gives him an opportunity to obtain an advantage over competitors who do not know or use it." Restatement of Torts, § 757, Comment b at 5 (1939).

Property interests in trade secrets have been recognized for over a century by English and American courts of equity, which have provided injunctive relief against their disclosure by a private party where the disclosure would violate a contract or a confidential relationship, or where the secret was discovered by improper means. *See Morrison v. Moat*, 9 Hare, 241, 20 L.J.Eq. 513 (1851); *Peabody v. Norfolk,* 98 Mass. 452, 96 Am.Dec. 664 (1868); *O. & W. Thum Co. v. Tloczynski*, 114 Mich. 149, 72 N.W. 140 (1897); *Stone v. Goss,* 65 N.J.Eq. 756, 55 A. 736 (1903); Restatement of Torts, § 757.

Federal courts in this country have treated trade secrets as property in a number of contexts. *See C. F. Simmons Medicine Co. v. Simmons,* 81 F. 163, 166 (C.C.Ark.1897) (injunctive relief against private party); *Darsyn Labs. v. Lenox Labs.,* 120 F.Supp. 42, 54 (D.N.J.1954), *aff'd,* 217 F.2d 648 (3d Cir. 1954), *cert. denied,* 349 U.S. 921, 75 S.Ct. 661, 99 L.Ed. 1253 (1955) (injunctive relief against private party); *E. I. Du Pont De Nemours and Company v. United States,* 288 F.2d 904, 909–912, 153 Ct.Cl. 274 (1961) (treatment of trade secrets as property within the Internal Revenue Code); *Underwater Storage, Inc. v. United States Rubber Co.,* 125 U.S.App.D.C. 297, 371 F.2d 950 (1966), *cert. denied,* 386 U.S. 911, 87 S.Ct. 859, 17 L.Ed.2d 784 (1967) (money damages

1. Count I alleges that the agency's denial of trade secret status for the substance in question was arbitrary and capricious, not in accordance with law, and otherwise violative of the Administrative Procedure Act. The Court's resolution of Count II makes it unnecessary to consider the allegation in Count I at this time.

for continuing misappropriation of trade secrets by a private party); 1 R. Milgrim, Trade Secrets § 1.01 (1977).

Protection has likewise been extended to trade secrets in federal statutes, in the form of safeguards against disclosure by government officials. *See, e. g.,* 18 U.S.C. § 1905 (1948) ("Disclosure of confidential information generally"); Freedom of Information Act, 5 U.S.C. § 552(b)(4) (1967); Government in the Sunshine Act, 5 U.S.C. § 552b(c)(4) (1976).

While some of these enactments give federal officials a measure of discretion as to whether they may reveal acknowledged trade secrets for reasons of the public interest, the provision under scrutiny here, section 5 of the Fair Packaging and Labeling Act, 15 U.S.C. § 1454, appears to absolutely exempt a holder of a trade secret from its reach. ("[N]othing in this paragraph shall be deemed to require that any trade secret be divulged.")

In considering whether these various indicators establish that trade secrets merit due process treatment, the Court is mindful of the teaching of *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972):

> Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that support claims of entitlement to those benefits.

The state and federal case law analyzing the nature of trade secrets, as well as the explicit protection accorded by the Fair Packaging and Labeling Act, *see Mathews v. Elridge,* 424 U.S. 319, 332, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), represent persuasive "independent sources" in this case. The Court finds that a trade secret is a property interest within the scope of the Due Process Clause of the Fifth Amendment.

This conclusion is supported by dictum in an early opinion of the United States Court of Appeals for the District of Columbia.

In *American Sumatra Tobacco Corp. v. Securities and Exchange Comm.,* 68 App. D.C. 77, 93 F.2d 236 (1937), several corporate parties objected to the disclosure of certain information included in securities registration statements they had filed with the Commission, on the ground, among others, that the information constituted trade secrets. The Commission determined that the public interest warranted disclosure. The issue before the Court of Appeals was not whether the Commission should be upheld on the merits, but whether the Court had jurisdiction to hear a direct appeal from the Commission's decision. In the course of deciding the jurisdictional question in favor of the private parties, the Court stated:

> Here the petitions for review allege irreparable injury through the threatened disclosure of the information contained in the applications which the petitions characterize as trade secrets . . . . In such case it is fundamental that the property rights of the citizen may not be put in jeopardy or destroyed in any proceeding before an administrative board without notice, hearing, and judicial review . . . . *Id.* 68 App.D.C. at 80, 93 F.2d at 239.

The Court indicated also that due process protection comes into play not only in situations in which an administrative agency acknowledges the trade secret status of information and wishes to disclose it for an overriding public purpose, but also in situations in which the agency disputes a colorable claim of trade secret status:

> [T]he discretion committed to the Commission, as to the determination of public interest and as to the question whether or not trade secrets or processes are involved, is a judicial discretion and requires the exercise of judgment. . . . [I]t was not the intention of Congress to deny a hearing where a prima facie case is made and in which the parties ask to be heard. *Id.*

More recently, the Supreme Court has confirmed that as long as there is a "legitimate claim of entitlement" to a protected

benefit or status, due process will "provide an opportunity for a person to vindicate those claims." *Roth, supra.*

## III.

Once it is determined that a claim of entitlement to trade secret status for one's product is a property interest deserving of due process, the question arises as to "what process is due." *Morrisey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972).

The central issue here—whether a given substance is a secret in the cosmetics trade or is instead in the public domain—has many of the characteristics ordinarily associated with questions of adjudicative fact. Zotos, a single corporation, claims that it is exceptionally affected by the denial of trade secret status for the substance in question, for reasons that involve its individual competitive position in the cosmetics industry. *Bi-Metallic Co. v. Colorado,* 239 U.S. 441, 446, 36 S.Ct. 141, 60 L.Ed. 372 (1915). The factors the agency was required to examine in weighing the claim involved, in part, specific information about the company and its activities, business, and property.[2] Insofar as a claim of entitlement to trade secret status can be compared to a claim of entitlement to a license, the pertinent facts to be determined would appear to be adjudicative. 1 K. Davis, Administrative Law § 7.18 at 493 (1958).

On the other hand, the nature of the research which must be conducted by the FDA is also suggestive of legislative fact-finding. Upon receiving a party's request for trade secret status, the agency's task is to comb the scientific literature in this country and abroad to ascertain if the substance is known in the cosmetics industry. While other considerations come into play,

the first criterion supplied by the Restatement—the extent to which the information is known outside the petitioner's business—is the crucial one. Presumably the question is amenable to objective scientific inquiry to some degree and involves information largely outside the petitioner's province.

■ The problem of what due process requires in this situation cannot be resolved by recourse to the adjudicative-legislative paradigm; the function performed by the agency has hybrid characteristics. Friendly, "Some Kind of Hearing," 123 U.Pa.L. Rev. 1267 (1975); 1 Davis, *supra* at § 5.01 at 297. The degree of due process provided, however, cannot be less than that accorded in instances of pure legislative fact-finding, and it is useful to consider a feature common to both processes.

■ A trial-type hearing conducted in an adjudicative affair need not always have the panoply of a formal courtroom proceeding, but "it is . . . fundamental that notice be given and that it be timely and clearly inform the individual of the proposed action and the grounds for it. Otherwise, the individual likely would be unable to marshall evidence and prepare his case so as to benefit from any hearing that was provided." Friendly, *supra* at 1280–1281. "The essence of due process is the requirement that 'a person in jeopardy of serious loss [be given] notice of the case against him and the opportunity to meet it.'" *Mathews v. Eldridge, supra* 424 U.S. at 348, 96 S.Ct. at 909, *quoting Joint Anti-Fascist Comm. v. McGrath,* 341 U.S. 123, 171–172, 71 S.Ct. 624, 95 L.Ed. 817 (1950) (Frankfurter, J., concurring).

■ The same basic principles appear in the law of legislative fact-finding, although in different and much less formal attire.

---

**2.** The factors the FDA is committed to considering in these cases originated in the Restatement of Torts, § 757, Comment b at 6, and are incorporated into the agency's regulations at 39 Fed.Reg. 44613 (1974). They include: (1) the extent to which the information is known outside the petitioner's business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent or

measures taken by him to guard the secrecy of the information; (4) the value of the information to the petitioner and his competitors; (5) the amount of effort or money expended by him in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

When what is involved is notice-and-comment rulemaking, the technique ordinarily used by federal agencies when they undertake legislative fact-finding, these agencies must adhere to the Administrative Procedure Act. Section 4(b) of the Act, 5 U.S.C. § 553, requires a notice in the Federal Register of any planned rule or regulation, which notice must include "the terms or substance of the proposed rule or a description of the subject and issues involved." There must then be an "opportunity to participate in the rule making through submission of written data, views, or arguments . . . ."

■ The FDA has chosen not to conduct its evaluations of trade secret requests according to the notice-and-comment provisions of § 553. Nevertheless, the course the agency takes must still adhere to elementary notions of fairness. In regulations the FDA promulgated in 1974 to implement the Freedom of Information Act for matters within its jurisdiction, the agency cited the *American Sumatra* case for the proposition that divulgence of information which may be a trade secret cannot occur without "notice, hearing, and judicial review," and indicated that it agreed "with the substance" of that view. 39 Fed.Reg. 44614 (1974). § 4.44 of the regulation, now codified at 21 C.F.R. 20.44, prescribes the FDA's method for weighing trade secret claims. As the Court sets out in more detail below, this methodology is incorporated by reference into the Cosmetic Labeling regulations which are the subject matter of this suit.

■ It is axiomatic that once an agency commits itself in its regulations to adhering to certain principles or procedures, it cannot violate them. Just as agencies which undertake § 553 rulemaking are bound by requirements of notice and an "opportunity to participate," so is the FDA bound by its own terms to provide notice and a hearing to parties claiming trade secret protection for a substance.

Case law construing the necessary characteristics of notice and an opportunity to participate under § 553 therefore suggests, by analogy, what due process requires, at a minimum, of the FDA's procedure for weighing trade secret claims.

The Chief Judge of the Court of Appeals for this Circuit writes that when § 553 works properly, "the agency must make continuous disclosure of the facts and assumptions on which it intends to rely in promulgating its rule." Wright, "The Courts and the Rulemaking Process: The Limits of Judicial Review," 59 Cornell L.Rev. 375, 381 (1974). Recent cases in the D.C. Circuit, he states, "have put useful teeth into the . . . notice provision." *Id.* at 380.

If an agency's empirical predictions constitute a substantial basis for its rule, the methodology of prediction should be made public so that interested parties have an opportunity to study and criticize it. If a flat rate is to be set for allocating costs between two industry services, the agency should specifically inform the public of this result and not merely report that *some* method of allocation is contemplated. (Emphasis in original.) If an agency wishes to base its rulings on facts developed in a corollary adjudication, the agency must say so, and interested parties must be allowed to contest the relevance of the adjudicatory record to the contemplated rulings. *Id.* at 380–381. (Citations omitted.)[3]

Another prominent commentator has expressed similar views about the minimum role to be served by § 553. "Every party cannot have the last word and some cutoff is necessary, but a main objective of § 553 procedure should be, as far as practicable, to let anyone comment on all the facts and all ideas that the agency considers." K.

---

**3.** *See also Hess & Clark, Division of Rhodia, Inc. v. Food and Drug Admin.*, 161 U.S.App. D.C. 395, 403, 495 F.2d 975, 983 (1974): "An agency may not validly take action against an individual without a hearing unless its notice to the individual of the adverse action proposed to be taken against him specifies the nature of the facts and evidence on which the agency proposes to take action. Such action enables the affected party to prepare an informed response which places all the relevant data before the agency."

Davis, Administrative Law of the Seventies § 6.01–3 at 179 (1976). It is a "rather fundamental proposition" that "parties must have an effective chance to respond to crucial facts." *Id.* at § 6.01–1–1 (July, 1977 Cumulative Supplement).

■ Applied to the situation before the Court, these authorities suggest that the rudiments of due process require that Zotos, in pressing its claim of entitlement to trade secret status before the FDA, have the means of engaging in a reasonably focused dialogue with the agency concerning the major issues in contention. Whether this dialogue is made possible by a meaningful notice of proposed agency action or a meaningful opportunity to participate after initial notice seems unimportant, but an occasion to address the government's position and the information on which the position is based must be one of its elements.

## IV.

The flaws in the procedures the FDA uses to weigh trade secret requests can be best understood by reference to the way those procedures evolved. In 1971 the Cosmetic, Toiletry and Fragrance Association, a trade group, proposed to the agency that it establish a program for the voluntary registration of both cosmetics producers and the ingredient statements of their products. 36 Fed.Reg. 16934 (1971). Whatever the Association's motive for cooperating with the agency, its explicit suggestion was that the filings would help the FDA enforce the ban against "adulterated" cosmetics imposed by section 601 of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 361 *et seq.*

In April 1972, the agency accepted the registration proposal and promulgated regulations modeled on Association submissions. 37 Fed.Reg. 7151 (1972). A provision for protecting any trade secret information included with the filings was made part of the regulation, in anticipation of efforts by competitors to obtain the information under the Freedom of Information Act. 37 Fed.Reg. 7155.

This registration program for The Voluntary Filing of Cosmetic Product Ingredient Statements remains in operation, presumably as an aid to the FDA's internal monitoring of cosmetics health and safety. 21 C.F.R. § 720.1 *et seq.*

In 1974 the FDA issued a comprehensive regulation designed to implement the Freedom of Information Act for all phases of the agency's jurisdiction—including food, drugs, additives and cosmetics. 39 Fed.Reg. 44601 (1974). Protection to trade secrets affected by the agency's various programs of voluntary industry cooperation was extended by § 4.44 of the regulation, entitled "Presubmission Review of Request for Confidentiality of Voluntarily Submitted Data or Information." See 21 C.F.R. § 20.44. The centerpiece of the protective scheme was a simple one; if trade secret status was requested and denied, the supplier of the disputed information was given "the option of . . . withdrawing the records" and thus curtailing his participation in the program involved.

To bring the 1972 Voluntary Filing project into line with the new comprehensive regulation, 21 C.F.R. § 720.8 was revised to incorporate the presubmission review scheme. 39 Fed.Reg. 44656.

Perhaps because the option of withdrawing records so effectively protects the voluntary submitter, the remaining provisions of 21 C.F.R. § 20.44, which prescribe how the agency shall consider claims of secrecy, set out a cursory and informal method:

(a) A party who believes a substance merits trade secret status may ask the FDA for a determination to that effect. "Any such request shall state why the date involved" constitutes trade secrets and the petitioner "shall enclose the records" supporting his claim.

(b) Pending a decision on the request, the records will be kept confidential by the agency.

(c) All final determination of trade secret claims will be made in writing.

21 C.F.R. § 720.8, after incorporating the procedures in § 20.44, provides an additional

safeguard; a decision to deny trade secret status is expressly deemed to be "final agency action" subject to review under the Administrative Procedure Act. If suit is brought within 10 days of the decision, the FDA will not disclose the records involved to any outside requester until the matter is resolved in court.

This was the situation in 1975, when the FDA issued its final order establishing a Cosmetic Labeling program pursuant to the authority in section 5 of the Fair Packaging and Labeling Act, 15 U.S.C. § 1454. As the Court has indicated, § 1454, by its terms, requires ingredient disclosure on labels unless a given substance is a trade secret. However, neither § 1454 nor the implementing regulations adopted by the FDA in 1975 at 40 Fed.Reg. 8918, now codified at 21 C.F.R. § 701.1 *et seq.*, lay out a fresh method for weighing trade secret claims. Instead, § 701.3 simply refers to the procedures set out at § 720.8 for the Voluntary Filing program, and thus incorporates § 20.44 by reference.

All this cross-referencing has a powerful effect. The only significant protection given trade secrets by the summary procedures in § 20.44 is the option to withdraw after an adverse determination, but the mandatory disclosure requirement of 15 U.S.C. § 1454 and its implementing regulations has the effect of reading the withdrawal option out of § 20.44 when consumer cosmetics are involved.

That is, an adverse determination of a trade secret claim arising under the Voluntary Filing program permits a submitter to withdraw his information pursuant to § 20.-44 and continue the marketing of his product. But an adverse determination under the Cosmetic Labeling program leaves the manufacturer with a much less attractive set of options. He can disclose the disputed ingredient on his product labels, take his products off the market altogether, or continue to sell without disclosure, thereby risking civil penalties pursuant to 15 U.S.C. § 1456 and 21 U.S.C. § 331 *et seq.*

Considered all together, the FDA's actions represent a careless and unsuccessful attempt to adapt standing regulations to a new situation. The remaining subject to be considered is whether the steps the agency actually took in this case pursuant to its procedures satisfy the due process requirements set forth earlier.

## V.

■ The chronology leading up to and including the FDA's "final" order of December 23 consists of four events: (a) Zotos' May 17, 1976 letter asking trade secret status; (b) the agency's June 2 letter seeking a "semi-quantitative formulation" to aid it in its evaluation; (c) Zotos' June 15 letter supplying the chemical formula; and (3) the agency's December 23 rejection of the trade secret request.

This brief exchange created serious practical disadvantages for Zotos. The question of whether a chemical formula is known to the public may involve information largely outside the petitioner's bailiwick, but scientific debates about the significance of that information may rage nevertheless.[4] The

---

4. "The inventor who enters the field of chemical inventions enters a different kind of field, a field where drawings and diagrams often mean almost nothing. The chemist is working in a field where upwards of 92 chemical elements, all with peculiar properties, divided into groups, according to certain of those properties, react in countless ways to produce new substances having both predictable and unpredictable physical, electrical and chemical properties. . . .

"A chemical invention may be dependent upon and turn on any one or more of those unpredictable properties, or it may be seriously limited by those properties, or it may concern itself only with the utilization of some half understood or hitherto unrecognized property.

"Any drawing accompanying a chemical patent is usually no more than an attempted visualization of an intangible and invisible mental concept, which constitutes the invention.

"A chemical invention, therefore, is likely to raise questions which never arise out of a mechanical invention, questions that arise from the difficulty of interpreting and describing something invisible, that arise from the impossibility of predicting what will happen in hitherto unknown situations, that arise from the

complex nature of trade secret and patent litigation, and the extended opportunities provided by the Rules of the U.S. Patent Office to rebut and re-argue adverse findings *de novo*, further belie the laymen's belief that scientific controversies are "objectively resolvable" in any simple sense of the term.

In this case, the FDA ranged far to gather evidence which, it believed, established a lack of trade secrecy for Zotos' product. An article in a German publication was found, as well as a French patent. Zotos could have not possibly have guessed which authorities the FDA would come to consult, or the scientific issues these authorities would raise. Before the agency revealed its "final" decision on December 23, it did not disclose "the facts and assumptions" on which it intended to rely, to quote the terms supplied by Chief Judge Wright. There was no "effective chance to respond to crucial facts," to quote the words of Professor Davis. The "notice" Zotos had of the FDA's proposed action was limited to the fact that 15 U.S.C. § 1454 and the agency's implementing regulations mandate the disclosure of cosmetic ingredients which are not trade secrets. This degree of notice fell far short of what is typically provided in § 553 rulemaking.

The shortcomings in the process were not remedied by any actions the agency took or permitted Zotos to take after December 23. In an analogous situation involving § 553, the Court of Appeals for this Circuit has written:

> The Administrator has urged that if we conclude the notice was defective we should disregard the defect because the agency . . . gave interested persons notice of an opportunity to petition for its amendment or repeal. . . . The short answer to this contention is that Section 4(b) of the Administrative Procedure Act requires notice *before* rulemaking, not after. (Emphasis in original.) The right of interested persons

to petition for the issuance, amendment or repeal of a rule, granted in Section 4(e) of the Act, is neither a substitute for nor an alternative to compliance with the mandatory notice requirements of Section 4(b). *Wagner Electric Corporation v. Volpe*, 466 F.2d 1013, 1020 (1972).

In its January 7, 1977, letter to Zotos, the FDA granted a 30-day stay so that the company could prepare a formal petition for reconsideration. In the same letter, however, the agency reiterated that the agency's first ruling "constitutes a final Agency determination." Considered together with the grant of the stay and the additional 30 days before Zotos would be required to exercise its option to sue, the legal significance of this statement, if any, is not clear. As a general matter, however, it seems to have been calculated to put Zotos on notice that the agency had no intention of examining its rebuttal information in a *de novo* proceeding.

This possibility appears borne out by the agency's March 22, 1977, response to the reconsideration petition. The response is a one-page letter which merely repeats conclusory findings contained in the December 23 letter; it addresses none of the specifics contained either in Zotos' petition for reconsideration or the affidavit accompanying it.

The shortcomings in the agency's process were not remedied by Zotos' right to sue, either. The Administrative Procedure Act guarantees judicial review of final administrative decisions as a matter of course; the scope of review is confined to whether the decision was "arbitrary and capricious," and this option in no way substitutes for adequate notice and an opportunity to participate before administrative action becomes final.

## VI.

 The Court concludes, therefore, that the procedures used by the FDA to evaluate trade secret requests arising under

---

failure of a chemist to see what he apparently ought to have seen but did not, and that arise from other easily overlooked factors." E.

Thomas and M. A. Auslander, Chemical Inventions and Chemical Patents 9–10 (1964).

section 5 of the Fair Packaging and Labeling Act, 15 U.S.C. § 1454, and the agency's implementing regulations, violate the Due Process Clause of the Fifth Amendment. The current practice prejudices a petitioner's chance to demonstrate that a given product is a trade secret, and modification of the practice to include additional safeguards would contribute substantially to the fair treatment of claims. *Mathews v. Eldrige, supra,* 424 U.S. at 335, 96 S.Ct. 893.

The fiscal and administrative burdens involved need not be substantial. *Id.* The Court does not believe that trial-type hearings are required to satisfy due process in this context. A petitioner must have some means, before an agency issues a final order, of engaging in a reasonably focused dialogue with the agency concerning the major points at issue in a trade secret request. An opportunity to address the government's position and the information upon which that position rests must be afforded, whether by the written or the spoken word. There would seem to be a variety of ways in which this opportunity could be presented, and the FDA is free to adopt the one most compatible with its existing resources and practices. The case is remanded to the agency for proceedings consistent with this opinion.