**LOCKHEED MARTIN CORPORATION, as Successor to Martin Marietta Corporation and Martin Marietta Technologies, Inc., and Affiliated Corporations, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 96–161T.**

United States Court of Federal Claims,

Nov. 18, 1998.

William F. Nelson, Atlanta, Georgia, with whom were Daniel J. King, Kimberly Piar, and Mark M. Maloney, for plaintiff.

Stuart J. Bassin, Washington, D.C., with whom were Edward L. Froelich, Loretta C. Argrett, Assistant Attorney General, Mildred L. Seidman, Chief, Court of Federal Claims Section, and Steven I. Frahm, Reviewer, for defendant.

## Opinion and Order
("Substantial rights" issue)

WEINSTEIN, Judge.

Plaintiff, Lockheed Martin Corp. ("Lockheed"), seeks a refund of $63,745,727 in federal income taxes for tax years 1984–1988 [1], representing qualified research expenditure ("QRE") tax credits to which plaintiff contends it was entitled for certain research expenses it incurred during the calendar years 1982 through 1988 in the performance of over 300 contracts with government and private entities. The Internal Revenue Service ("IRS") disallowed the research tax credits sought in this refund action on the grounds that the research was funded and the taxpayer did not retain substantial rights in the research.[2]

The parties have agreed to proceed in this litigation by briefing separately each of the defenses raised by defendant. The defense at issue here is whether, as defendant claims, plaintiff failed to retain substantial rights in the research for which it claims it incurred QRE, thus, under Treas. Reg. 1.41–5(d) [3], disqualifying the claimed credit for research expenses (the substantial rights issue). Plaintiff has moved for partial summary judgment on the "substantial rights" issue and defendant has cross-moved for summary judgment. For the reasons discussed below, the court concludes that plaintiff failed to retain substantial rights in the research for which it claims a research tax credit. Therefore, plaintiff's motion is denied, and defendant's cross-motion is granted.

### Background

Lockheed, a major aerospace company, incurred wages and research expenses in the years 1982–1988 in performing over 300 contracts with the government and private entities. About 80% of these expenditures were incurred in the performance of its 13 largest contracts. Approximately 65% were incurred in performing its four largest contracts, involving the LANTIRN, SLAT, SICBM, and Titan IV programs (the "Major Programs"). Its refund claims (and this refund suit) are based on Lockheed's claim that it is entitled to QRE tax credits under section 44F of the 1954 I.R.C., and section 41 of the 1986 I.R.C., for these expenditures.

A brief description of the Major Programs is set out below:

### LANTIRN

Research expenses for the "Low Altitude Navigation and Targeting InfraRed for Night," represent $192 million of the claimed QRE. The LANTIRN technology was developed to permit precision delivery of bombs and precision nighttime aircraft operation. The LANTIRN weapons system consisted of two "pods," a navigation pod and a targeting pod, mounted under the wings of fighter-bombers, which contained various lasers, infra-red sensors, terrain-following radar, and

---

1. The tax returns for the years at issue were filed by Martin Marietta Corp., the parent of a consolidated group of corporations filing jointly. As the result of a reverse triangular merger on April 2, 1993, Martin Marietta Corp. became Martin Marietta Technologies, a wholly-owned subsidiary of a new Martin Marietta Corp. As the result of another reverse triangular merger, on March 15, 1995, the new Martin Marietta Corp. became a wholly-owned subsidiary of plaintiff, Lockheed.

2. The substantial rights defense is one of three major defenses against plaintiff's QRE claim. Each is being briefed separately. The other two regard the so-called service contracts and subcontractor issues.

3. Citations to the Internal Revenue Code of 1954 or to the Internal Revenue Code of 1986, as amended ("I.R.C." or "Code"), codified at Title 26, United States Code, and to the Treasury Regulations ("Treas.Reg.") found at Title 26, Code of Federal Regulations, are to the provisions in effect during the years at issue.

other electronics. The claimed QRE on LANTIRN was split roughly evenly between two separate contracts—a full scale development contract and a production contract.

*SICBM*

The "Small Intercontinental Ballistic Missile" program, (also known as the "Midgetman"), generated $134 million of the claimed QRE. An SICBM was to be a relatively small, mobile, and inexpensive device designed to launch nuclear warheads during the Cold War. It was to have a range of 5000 miles, to carry a single nuclear warhead, and to be launchable from a device mounted on the back of a large truck. The program was never completed because the government terminated the SICBM contract for convenience. *See* Stipulation Regarding the "Substantial Rights" Issue, filed Sept 12, 1997 ("Stip."), 116.

*SLAT*

The "Supersonic Low Altitude Target" program resulted in $78 million of claimed QRE. The SLAT, which performed like a ship-to-ship missile, was a reusable rocket-powered missile designed to fly at supersonic speeds at low altitudes. It was designed as a training tool by the Navy; sailors were to practice using the anti-missile defense systems on their warships against SLAT target drones. The SLAT program never entered a production phase, because the government elected not to buy production units. Stip. 122.

*Titan IV*

The costs incurred for the Titan IV program represent $46 million of the claimed QRE. The Titan IV, like its many predecessors (also built by Lockheed), was a space launch vehicle for placing satellites into earth orbit. It was somewhat taller and wider, able to launch larger payloads, and incorporated more advanced electronics than its predecessors.

On October 25, 1991, Lockheed filed refund claims, on Form 1120-X, for QRE during tax years 1984–1988. On November 30, 1993, the IRS issued a Technical Advice

Memorandum (TAM) concluding that the research was ineligible for the tax credit under 1954 I.R.C. § 44F and 1986 I.R.C. § 41(d)(4)(H) because it was "funded" by the contracts to which it related.[4] The TAM concluded that the research was "funded" because (1) the payment by the government for Lockheed's research expenses was not contingent on the success of the research, and (2) Lockheed did not retain "substantial rights" in the research. *See* Treas. Reg. § 1.41–5(d). A Revenue Agent's Report (RAR) was signed in November 1994 after the IRS's examination of Lockheed's claims, during which Lockheed produced computer-generated schedules ("Initial Summaries" or "Green Books") of specific expenditures incurred under the thirteen largest contracts subject to the refund claims. The RAR concluded that Lockheed would be entitled to an additional credit of approximately $49.5 million if it prevailed on the funding and substantial rights issues. The RAR also disallowed two other classes of expenditures: subcontractor costs (because the subcontractors may have claimed credits for the same research), and expenses associated with certain service contracts (those contracts which did not require the incorporation of the research into a "deliverable" item or thing). See *supra* note 2.

On April 14, 1995, the IRS denied the following amounts of QRE credit claimed for the following tax years: $6,866,861 for 1984; $183,158 for 1985; $30,460,599 for 1986; $22,-599,169 (the entire claim) for 1987; and $5,168,472 (the entire claim) for 1988. The disallowance letter stated: "The research credit is not allowed because the research was funded and the taxpayer did not retain substantial rights in the research. See Treas. Regulation § 1.41–5(d)." Lockheed filed this refund suit on March 21, 1996.

The "substantial rights" issue is presented by the Major Programs (as well as by other programs). The parties have stipulated that the "substantial rights" issue is to be resolved by reference solely to the rights retained (or not) by Lockheed in its research

---

4. 1986 I.R.C. § 41(d)(4)(H) excludes from the QRE "[a]ny research to the extent *funded* by any grant, contract, or otherwise by another person

(or governmental entity)" (emphasis added). 1954 I.R.C. § 44F contains an almost identically worded provision. *See* § 44F(d)(3).

under the Major Programs. *See* Stipulation Regarding Determination of Issues, ¶¶ 2–4. The parties have agreed to extend the court's determination of the issue under the Major Programs, *pro rata,* to the QRE expenses for all years and programs in suit. Stip. 90.

The contractual rights and obligations of the parties under each of the SICBM, Titan IV, and SLAT programs are governed by a single contract, as modified. Stip. 90. The contracts for the programs were executed on Sept. 10, 1984 (SLAT), Feb. 28, 1985 (Titan IV), and June 26, 1985 (SICBM). Stips. 95, 113, 118. The LANTIRN program is governed by 2 contracts: LANTIRN FSED (which stands for "Full Scale Engineering Development") (dated Sept. 17, 1980) and LANTIRN Production (dated Apr. 1, 1985). Stips. 91, 103, 108; Stip. Exh. 23.

*Patent Rights*

Each of the Major Programs contracts, other than the LANTIRN Production contract, Stip. 104, incorporates by reference standardized regulatory clauses (DAR § 7–302.23 and FAR § 52.227–12) dealing with the patent rights retained by the contractor. *See* Stip. Exh. 23.

DAR § 7–302.23(b)(1) provides:

(1) The contractor may retain the entire right, title, and interest throughout the world or any country thereof in and to each Subject Invention disclosed pursuant to paragraph (e)(2)(i) of this clause, subject to the rights obtained by the Government in paragraph (c) of this clause. The Contractor shall include with each Subject Invention disclosure an election as to whether he will retain the entire right, title, and interest in the invention throughout the world or any country thereof.

DAR § 7–302.23(c) provides that, at minimum, the contractor grants to the government a nonexclusive, nontransferable, paid-up license to make, use, and sell the subject invention. It also agrees thereby to grant a license to responsible applicants, upon request of the government.

DAR § 7–302.23(b)(2) provides, in pertinent part:

Subject to the license specified in paragraph (d) of this clause, the Contractor agrees to convey to the Government, upon request, the entire domestic right, title, and interest in any Subject Invention when the Contractor: ... (ii) fails to have a United States patent application filed on the invention in accordance with paragraph (j) of this clause [which requires such an application to be filed within six months after submission of the invention disclosure unless the contracting officer approves a longer time], or decides not to continue prosecution of such application ....

DAR § 7–302.23(b)(3) similarly addresses rights in subject inventions in any foreign country. In the event that the entire domestic or foreign right, title, and interest in a subject invention is conveyed to the government pursuant to DAR § 7–302.23(b)(2) or (3), § 7–302.23(d) provides for the contractor to reserve "a revocable, nonexclusive, royalty-free license in each patent application filed in any country on a Subject Invention and any resulting patent in which the Government acquires title." *See* DAR § 7–302.23(d)(1). However, § 7–302.23(d)(2) provides that this license may be revoked or modified under certain circumstances. FAR § 52.227–12 contains similar provisions to those of DAR § 7–302.23.

Lockheed filed Form DD882, "Report of Inventions" for the SICBM and SLAT contracts, identifying five Subject Inventions under the SICBM program, as to which the Air Force owns the patent to one, and four Subject Inventions relating to the SLAT program. Lockheed did not identify any Subject Inventions in connection with the Titan IV program, or with either of the LANTIRN programs.

Lockheed did not apply for, or obtain, patents under any of the Major Program contracts. Stips. 96, 106, 119. It has a pending patent application relating to a part of the LANTIRN device. However, this was developed under Lockheed's Independent Research and Development (IRAD) program [5], a separate program. Stip. 105. In any

---

5. The funds for IRAD come from the overhead rates charged by Lockheed on its various contracts with the government. Jt.App. 293 (Marini Dep. 33–34).

event, because of a secrecy order issued by the Department of Defense (DOD), the patent has not been issued.

*Rights to Technical Data and Computer Software*

Each of the Major Programs contracts also incorporates by reference standardized regulatory clauses (DAR § 7–104.9(a) and (b), and FAR § 52.227–7013) dealing with the government's rights in technical data and computer software. *See* Stip. Exh. 23.

Section (b)(1) of DAR § 7–104.9(a) and (b) gives the government unlimited rights in the technical data and computer software generated as a result of the performance of the work required by the contract. Section (a)(7) of the regulatory clause defines unlimited rights as "rights to use, duplicate, or disclose technical data or computer software in whole or in part, in any manner and for any purpose whatsoever, and to have or permit others to do so."

Section (b)(2) of DAR § 7–104.9(a) and (b) provides certain narrow exceptions to the government's unlimited rights, such as for data listed or described in the parties' contract as data in which the government's rights are limited, and for data developed at private expense. FAR § 52.227–7013 contains similar provisions.

In addition to the regulatory provisions relating to rights in technical data and computer software, the LANTIRN Production contract contains a special technical data rights provision stating that the government would not have unlimited rights to all technical data and computer software used by the contractor until 60 months after the first delivery of production items under the contract. Stip. 109; Stip. Exh. 33. After that period, the government was to have unlimited rights, with one specified exception relating to a component supplied by another company.[6] Other than this exception, Lockheed identified no technical data in the Major Programs as giving the U.S. government only limited rights.

Under similar contract provisions, the government disclosed to completing contractors, or required Lockheed to disclose, technical information regarding at least two other programs (the Patriot Canister and the Vertical Launch System ("VLS") programs) that had been the subject of government procurement contracts, in order to establish a second source for the products at issue. Stips. 148–151, 153–155; Jt.App. 69 (Silver Dep. at 53–56). Based on these disclosures, the Southwest Mobile Corporation ("SMC") was established as a second source for the Patriot Canister, Stip. 151, and the Northern Ordnance Division of the FMC Corporation ("NOD/FMC") was established as a second source for the VLS, Stip. 154.

In March 1984, the Navy contracted with Lockheed to provide liaison support to NOD/FMC, specifically, to teach NOD/FMC the technology and processes Lockheed used in constructing the VLS, and to provide NOD/FMC with some of the VLS components. Stip. 155. The Navy paid Lockheed $27.4 million for the liaison work. *Id.* As a result of this contract, NOD/FMC became a producer of the VLS and Lockheed's competitor on the domestic front. For example, in one contract award for the production of eight VLS sets, NOD/FMC won two sets and Lockheed won six. *Id.*

Lockheed did not have a contract to provide liaison support or technical instruction to SMC in connection with the Patriot Canister. Jt.App. 70 (Silver Dep. at 60). (The only compensation that Lockheed received in connection with the second source effort of SMC was for its sale of certain hardware, like brackets, to SMC.) However, after being designated as a second source contractor for the Patriot Canister, SMC, at times in competition with Lockheed, won the next production contract, a multi-year procurement called Buy 8, 9, 10, as well as production Buys 11, 12, and 13 for the Patriot Canister.

Another instance where the government provided technical data developed by Lockheed to competing contractors occurred during the course of competition for the evolved

---

6. The exception to the government's unlimited rights related to technical data and computer software used in the development or manufac-

ture of the LANTIRN's radar test equipment, which had been supplied by Grumman Aerospace. Stip. Exh. 33.

expendable launch vehicle ("EELV") contract, the next generation of space launch vehicles after Titan IV. At that time, the Air Force provided technical data from Lockheed relating to the Titan IV payload fairing requirements to competing contractors for their use in preparing proposals. Def. Cross–Motion for Summary Judgment, App. B. at 105–06, Exh.6, Wilkins Decl. at 1–2.

*Direct Foreign Sales and Foreign Military Sales*

The sale of Lockheed's defense-related products to foreign governments occurred through two methods: "direct foreign sales" and "foreign military sales." Stip. 125. In a direct foreign sale, Lockheed contracted directly with a foreign government for the sale of Lockheed's defense products and the U.S. government was not a party to the contract. Stip. 126. A foreign military sale involved two contracts: one between Lockheed and the U.S. for the procurement of the defense items from Lockheed, and the other between the U.S. and the foreign government, under which the U.S. sold the defense items to the foreign government. Stip. 128. Lockheed's "Summary of Sales by Program," Stip. Exhs. 40 and 41, shows that, during 1980–1995, Lockheed received approximately $126 million through direct foreign sales, and $2.5 billion through foreign military sales. Stips. 127, 129. In other words, Lockheed's revenues from direct foreign sales constituted about 5% of its revenues from foreign military sales. Lockheed has received more than $96 million in royalties and technology transfer fees and more than $514 million for services, Stip. 130, Stip. Exh. 35, but none of these revenues have been generated by any of the Major Programs, Stip. 131.

*Lockheed's Use of Research and Sales Relating to Major Programs*

*Titan IV*

By the time plaintiff filed its motion for summary judgment on October 30, 1997, the Titan IV program had made twenty-one launches. The first twenty vehicles carried DOD payloads; the twenty-first, launched in October 1997, carried a NASA payload. Stip. 100. Lockheed has a current contract with the U.S. government to provide a total of 41 Titan IV launch vehicles.

Lockheed used technologies developed during the Titan IV program for its research and development in other programs. For example, the modeling techniques for loads and dynamics and some of the software techniques developed on Titan IV were used in the EELV. Jt.App. 315, 318 (Rivers Dep. at 18, 30). In addition, Lockheed has had four commercial sales of launches in its commercial Titan T program, for which it combined technology developed under Titan III with the liquid rocket engines developed in the Titan IV program. Jt.App. 319 (Rivers Dep. at 31–32). However, some of the technologies developed during the Titan IV program were developed by other contractors. For example, the payload fairing for the Titan IV was developed by McDonnell Douglas and the liquid engines were developed by Aerojet, through subcontracts with Lockheed. Jt. App. 317 (Rivers Dep. at 25); Plaintiff's Statement of the Case, Exh. B at 25.

*LANTIRN*

Lockheed has sold the LANTIRN system, in some form, to several foreign governments in recent years. Stip. 112; Jt.App. 264 (Walker Dep. at 16). It has produced documentation, Stip. Exh. 35, showing that it generated more than $1.15 billion in revenue through LANTIRN-related foreign military sales and approximately $7.5 million in LANTIRN-related direct foreign sales (*i.e.*, 0.65% of foreign military sales). Stip. 112.

Lockheed used LANTIRN technologies in several different programs, for government and non-government customers. Jt.App. 291, 294–95, 298 (Marini Dep. at 27, 40–42, 54–55). For example, the LANTIRN FLIR ("forward-looking infra-red") developed under the LANTIRN program, was used under a subsequent A–12 aircraft contract with the U.S. government. Jt.App. 291 (Marini Dep. at 27–28).

Lockheed also developed derivatives of the LANTIRN pods, such as the Pathfinder and the Sharpshooter, for sale to foreign customers. Jt.App. 265, 267, 271 (Walker Dep. at 19, 25–26, 41). The Pathfinder, a derivative of the LANTIRN navigation pod, was developed by taking the FLIR out of the navigation pod, repackaging it into a smaller pod

without the terrain-following radar, and adding certain features developed independently of the LANTIRN contracts. Jt.App. 265, 271, 284 (Walker Dep. at 19–20, 41). To date, Lockheed has made only one Pathfinder sale, a foreign military sale to the government of Egypt. Jt.App. 266 (Walker Dep. at 22).

The Sharpshooter was a derivative of the LANTIRN targeting pod but without its automatic infra-red maverick (missile) hand-off capability. Jt.App. 267 (Walker Dep. at 25–26). Lockheed sold the Sharpshooter to several foreign governments through foreign military sales. *Id.* (Walker Dep. at 26–27).

The development of certain components of the LANTIRN device, namely, the digital FLIR, the digital tracker, and certain advanced optics, was at least partially funded by IRAD (independent research and development) funds. Jt.App. 293, Marini Dep. at 33–36.

*SICBM*

Lockheed has not attempted to sell SICBM commercially. Stip. 117. However, it has applied technologies it developed under the SICBM program to other programs. Jt. App. 350 (Romine Dep. at 21). For example, Lockheed used the technology developed from building the shroud and the upper stage propulsion system of the SICBM to bid for and win the award of the multi-service launch systems ("MSLS") contract, and it applied the guidance control computer program developed during the SICBM program to the Titan and EELV programs. Jt.App. 350–51 (Romine Dep. at 22–23). In addition, the knowledge gained and analytical techniques developed during the SICBM program were applied in several other programs. Jt.App. 351–52 (Romine Dep. at 23–29); Jt.App. Exh. AA.

*SLAT*

Lockheed has not attempted to sell SLAT commercially. Stip. 123. However, the business application strategy for the SLAT program, from the outset, was to use SLAT as a technology base for a multitude of programs. Lockheed documents titled "Exploitation of SLAT Technology," and "SLAT Mid–Contract Business Application Strategy," show how Lockheed could utilize SLAT technology in future missile systems and other programs. Jt.App. 543–44, Exh. V. A chart of 25 components used in the SLAT program shows, for each component, how Lockheed pursued the transfer of its SLAT technology into other programs. Jt.App. 545, Exh. V.

*Restrictions on Lockheed's Use of the Results of Research*

Certain aspects of each of the Major Programs were subject to security classification guidelines. Stip. 98, 110, 115, 121. In addition, under all Major Program contracts, Lockheed was required to seek the prior approval of the State Department before entering any kind of licensing agreement, technology transfer, or technical assistance agreement; before exporting any hardware to a foreign entity; or before it could even discuss any technical information not in the public domain. In his deposition, Lockheed's representative, Edward Van Akin, described the Department of State's approval power pursuant to the International Traffic in Arms Regulations (ITAR), 22 C.F.R. §§ 120–130, as providing the State Department with "a choke hold on what technology could be exported." Jt.App. 123 (Akin Dep. at 105–06).

In some cases, the defense products (such as LANTIRN derivatives) sold to foreign militaries did not have the full capability of their equivalents provided to the U.S. government, particularly in those areas which related to resistance to countermeasures and laser coding. Jt.App. 226–227 (Hayward Dep. at 48–49). However, in other cases not involving those areas, foreign customers obtained hardware that either was identical to, or exceeded the capabilities of, the original hardware developed for the U.S. government. Jt.App. 227, 241 (Hayward Dep. at 49, 105–06).

*Recoupment of Nonrecurring Costs*

The original agreements relating to each of the Major Programs contain standardized regulatory clauses (DAR § 7–104.64, and FAR § 52.235–7002) dealing with the government's recovery of nonrecurring costs on commercial sales. *See* Stip. Exh. 23. These provisions required the contractor to "[r]eimburse the U.S. Government for a fair share of U.S. Government expenditures for nonre-

curring costs applicable to the items [to be sold]." The provisions applied to all sales (other than those to the U.S. government) "by a defense contractor of products, technology, material, services, and/or development or production techniques that were originally developed, improved, or produced using DOD appropriations/funds." Stip. Exh. 23 (DAR § 7–104.64(a)(1) and (b)(1)). Pursuant to DAR § 7–104.64, the contractor was required promptly to notify the DOD and "obtain the applicable nonrecurring recoupment charge" whenever it intended "to enter into domestic or foreign commercial sales for items in [the procurement] contract, or essentially similar items, or enter into license or technical assistance agreements for the technology developed under [the] contract." Stip. Exh. 23 (§ DAR 7–104.64(b)). FAR § 52.235–7002 contains identical provisions.

The parties have identified two programs, the Pave Penny detector device and the VLS system, which have contract recoupment provisions similar to those in the Major Program contracts. Lockheed paid recoupment charges to the U.S. government with respect to both. In the first, Lockheed entered into two contracts with the government of Israel for the sale of the Pave Penny device (which had been developed and manufactured in a procurement contract with the Air Force, Stip. 135), for which it paid the U.S. government approximately $762,000 in recoupment charges. Stip. 137. Lockheed also paid a recoupment charge of $263,718 in connection with the sale of twenty-six Pave Penny devices to the government of Singapore. Stip. 140; Stip. Exh. 48. Lockheed received more than $42 million in proceeds from Pave Penny during the period 1980–1991. Stip. 141.

Lockheed's sale, sometime prior to November 7, 1989, Stip. 143, of two VLS systems, developed and manufactured pursuant to a procurement contract with the Navy, Stip. 142, to the government of Canada also resulted in recoupment charges (of $2,465,726). Stip. 145; Stip. Exh. 42. However, these recoupment charges were subsequently repaid to Lockheed pursuant to a waiver granted by the Navy. Stip. 146.

Although the Air Force informed Lockheed that there would be a recoupment charge for the Pathfinder, and there were published recoupment charges for other LANTIRN products and derivative products, no recoupment charges have been paid by Lockheed in connection with the sale of any LANTIRN-related product, Jt.App. 270 (Walker Dep. at 39), nor in connection with the Titan IV contract. However, it should be noted that recoupment charges apply only to commercial sales, and there have been no commercial (including foreign) sales of Titan IV or its production techniques. Jt.App. 323–24 (Rivers Dep. at 48–49, 51). Moreover, 99.35% of the revenues generated as a result of the sale of LANTIRN-related products were foreign military sales (*i.e.* sales through the U.S. government), Stip. 112, to which the recoupment charge does not apply.

### Standard of Review

Summary judgment is appropriate when there is no genuine issue as to a material fact and the movant, based on the uncontroverted facts, is entitled to judgment as a matter of law. Rule 56(c) of the Rules of the Court of Federal Claims (RCFC); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A material fact preventing summary judgment is one that is relevant and necessary to establishing or defending against the claim and that may affect the outcome of the decision; an issue is genuine if a reasonable finder of fact could decide the question in favor of the non-movant. *KeyStone Retaining Wall Sys., Inc. v. Westrock, Inc.*, 997 F.2d 1444, 1449 (Fed.Cir. 1993); *Opryland USA Inc. v. Great Am. Music Show, Inc.*, 970 F.2d 847, 849–50 (Fed. Cir.1992). That both parties have moved for summary judgment neither establishes the absence of any genuine issue of material fact nor requires the court to grant summary judgment to either side. *Prineville Sawmill Co. v. United States*, 859 F.2d 905, 911 (Fed. Cir.1988); *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed.Cir. 1987).

"Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the

Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex*, 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 1, upon which RCFC 1 was based). *See also Avia Group Int'l, Inc. v. L.A. Gear Cal., Inc.*, 853 F.2d 1557, 1560 (Fed.Cir.1988); *Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1562 (Fed.Cir.1987).

### Applicable Law

The research tax credit was established in 1981 as part of the Economic Recovery Tax Act of 1981, Pub.L. No. 97–34, 95 Stat. 172 (1981), and codified as section 44F of the I.R.C. of 1954. In 1984, it was renumbered as section 30 without modification. *See* Deficit Reduction Act of 1984, Pub.L. No. 98–369, 99 Stat. 494 (1984). The Tax Reform Act of 1986, Pub.L. No. 99–514, 100 Stat.2085 (1986), extended the research credit to the period from 1986 to 1989, amended section 30, and renumbered it as section 41 of the I.R.C. of 1986. Since the provisions pertinent to the "substantial rights" issue are substantially similar in I.R.C. § 44F (1954), I.R.C. § 30 (1954), and I.R.C. § 41 (1986), the court's analysis of the provisions of I.R.C. § 41 (1986) applies also to the years between 1981 and 1986.

I.R.C. § 41(a) provides a research credit "in an amount equal to the sum of—(1) 20 percent of the excess (if any) of—(A) the qualified research expenses for the taxable year, over (B) the base amount, and (2) 20 percent of the basic research payments . . . ." Section 41(b)(1) states that "[t]he term 'qualified research expenses' means the sum of the [in-house and contract research expenses] which are paid or incurred by the taxpayer during the taxable year in carrying out any trade or business of the taxpayer . . . ." *See also* § 44F(b)(1). Section 41(d) defines "qualified research" as "research . . . with respect to which expenditures may be treated as expenses under section 174 . . . ." *See also* § 44F(d). The provision at issue here is section 41(d)(4), which provides that "[t]he term 'qualified research' shall not include any of the following: . . . (H) Funded research.— Any research to the extent funded by any

grant, contract, or otherwise by another person (or governmental entity)." *See also* § 44F(d)(3).

The research credit statutory provisions do not define the term "funded" or mention "substantial rights." Rather, the term "substantial rights" appears in the regulations interpreting the "funded" exclusion. Treas. Reg. § 1.41–5(d) provides, in pertinent part:

(d) Research funded by any grant, contract, or otherwise—

(d)(2) Research in which taxpayer retains no rights. If a taxpayer performing research for another person retains no substantial rights in research under the agreement providing for the research, the research is treated as fully funded for purposes of section 41(d)(4)(H), and no expenses paid or incurred by the taxpayer in performing the research are qualified research expenses. For example, if the taxpayer performs research under an agreement that confers on another person the exclusive right to exploit the results of the research, . . . the research is fully funded. . . . Incidental benefits to the taxpayer from performance of the research (for example, increased experience in a field of research) do not constitute substantial rights in the research. . . .

(d)(3) Research in which taxpayer retains substantial rights.—(d)(3)(i) . . . A taxpayer does not retain substantial rights in the research if the taxpayer must pay for the right to use the results of the research. . . .

The "substantial rights" requirement also appears in Treas. Reg. § 1.41–2(a)(3), which provides that if the taxpayer performs research for another and retains no substantial rights in the research, then the research does not qualify for the credit. *See* § 1.41–2(a)(3)(i). Section 1.41–2(a)(3) contains cross-references to § 1.41–5(d)(2) and (3).

### Discussion

Plaintiff contends that it retained substantial rights in the research it performed pursuant to the government contracts at issue and, therefore, that the research is not excluded from qualified research on this basis. Defendant, on the other hand, contends that plaintiff retained no substantial rights, but

only incidental benefits, in the research and, therefore, that the research was fully funded and excluded from qualified research.

Plaintiff has challenged the validity of the substantial rights requirement of Treas. Reg. § 1.41–5(d), based on the fact that the substantial rights requirement is not mentioned in I.R.C. § 41. Plaintiff argues that nothing about the term "funded" implies a definitional element relating to the ownership of the thing being funded. Plaintiff contends, therefore, that the regulation is invalid and that the only proper statutory source of the substantial rights requirement is the statutory requirement of I.R.C. § 41(b)(1), which provides that the creditable research expenses must be paid or incurred in the taxpayer's trade or business.

■ The standard of review of the validity of a treasury regulation, and the weight to be accorded to such regulation, depends on whether the regulation is legislative or interpretive in character. *See Schuler Indus., Inc. v. United States,* 109 F.3d 753, 754 (Fed.Cir.1997). Legislative regulations are those issued under a specific grant of congressional rulemaking authority, and are accorded "controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *See id.* at 755 (quoting *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)). Interpretive regulations are those issued under the general authority vested in the Secretary of the Treasury by I.R.C. § 7805, and are upheld if they implement the congressional mandate in a reasonable manner. *Id.* at 754–55. An interpretive regulation should be accorded "considerable weight" and "a court

may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Chevron,* 467 U.S. at 844, 104 S.Ct. 2778.

■ Treas. Reg. § 1.41–5(d) does not appear to have been issued under a specific grant of congressional rulemaking authority and therefore is an interpretive regulation. As such, it should be upheld if it implements the congressional mandate of I.R.C. § 41 in a reasonable manner. The court concludes that the Secretary's incorporation of a substantial rights inquiry in Treas. Reg. § 1.41–5(d) is a reasonable construction of I.R.C. § 41(d)(4)(H)'s funded exclusion. That is because, as defendant correctly argues, there is a clear connection between payment for research and the allocation of rights to research results.[7] As defendant notes, a similar "funded" exclusion for the clinical testing credit, set forth in I.R.C. § 45C (formerly codified at § 28), has been interpreted as incorporating an almost identical substantial rights requirement. *See* Treas. Reg. § 1.28–1(b)(3). Therefore, the court declines to invalidate Treas. Reg. § 1.41–5(d)'s definition of "funded" research as incorporating a "substantial rights" element.

Plaintiff also challenges the continuing validity of Treas. Reg. § 1.41–5, given that its title indicates that it applies to pre–1986 tax years only. However, Congress's repeated reenactment of the research credit statute, without any change to the language of the regulation interpreting the "funded" exclusion in I.R.C. § 41(d)(4)(H) as embodying a substantial rights standard, suggests that

---

7. Congress's recognition of the link between payment for research and rights to the research results is demonstrated by its enactment in 1984 of 10 U.S.C. § 2320, which relates to the government's rights in technical data developed during the performance of government contracts. 10 U.S.C. § 2320(a)(2) provides, in pertinent part:

(A) In the case of an item or process that is developed by a contractor or subcontractor exclusively with Federal funds ..., the United States shall have the unlimited right to—(i) use technical data pertaining to the item or process; or (ii) release or disclose the technical data to persons outside the government or permit the use of the data by such persons.

(B) ... in the case of an item or process that is developed by a contractor or subcontractor exclusively at private expense, the contractor or subcontractor may restrict the right of the United States to release or disclose technical data pertaining to the item or process to persons outside the government, or permit the use of the technical data by such persons.

Therefore, under 10 U.S.C. § 2320, the source of funding for the research determines whether the government will obtain limited or unlimited rights to technical data generated by the research.

Congress approved of this administrative interpretation of the funded exclusion. *See Johns–Manville Corp. v. United States,* 855 F.2d 1556, 1559 (Fed.Cir.1988) (quoting *Lorillard v. Pons,* 434 U.S. 575, 580, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978)) ("Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change.") *See also Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,* 456 U.S. 353, 381–82, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982) (Congress's comprehensive reexamination and significant amendment of the Commodity Exchange Act, which left intact the statutory provisions under which federal courts had implied a cause of action, is evidence that Congress affirmatively intended to preserve that remedy); *Clean Harbors Envtl. Servs., Inc. v. Herman,* 146 F.3d 12, 19–20 (1st Cir.1998) (presuming Congress, when it reenacted the statute without change, was aware of, and approved, the administrative and judicial interpretations of the Safety Transportation Assistance Act's whistleblower provisions as protecting employees making purely internal complaints in addition to those filing complaints with a court or agency). Moreover, the substantial rights requirement is contained also in Treas. Reg. § 1.41–2(a)(3), which references § 1.41–5(d), and applies to post–1986 years. This suggests that Treas. Reg. § 1.41–5(d)'s interpretation of the funded exclusion was intended to have continued validity after 1985.

To determine whether plaintiff retained substantial rights in the research it performed, one must determine the nature and degree of the rights deemed substantial under Treas. Reg. § 1.41–5(d). Plaintiff interprets the substantial rights requirement as requiring merely that the researcher retain the right to use the research in the researcher's trade or business, regardless of whether the researcher can prevent the unauthorized disclosure and use of the research by others. It argues that the substantial rights requirement disqualifies the researcher from receiving a research credit *only* where the researcher retains *no* rights to the research. Defendant, on the other hand, interprets the requirement as requiring, at a minimum, that the researcher retain the right to prevent the unauthorized use or disclosure of the results of the research. It, however, does not concede that plaintiff retained the right to use the research.

■ Plaintiff's interpretation of the substantial rights requirement as disqualifying the researcher from receiving a research credit *only* where the researcher retains *no* rights to the research, cannot be a correct interpretation since it renders superfluous the word "substantial" in the regulation. It is a settled rule of statutory construction that a statute must be construed, if possible, to give meaning and effect to every word or provision. *See United States v. Nordic Village, Inc.,* 503 U.S. 30, 36, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992) ("a statute must, if possible, be construed in such a fashion that every word has some operative effect"); *Bausch & Lomb, Inc. v. United States,* 148 F.3d 1363, 1367 (Fed.Cir.1998) (a statute should be construed, if at all possible, to give effect and meaning to all the terms); *Ishida v. United States,* 59 F.3d 1224, 1230 (Fed.Cir.1995) ("[t]he rules of statutory construction require a reading that avoids rendering superfluous any provision of a statute"). This rule also applies to regulatory construction. *Silverman v. Eastrich Multiple Investor Fund, L.P.,* 51 F.3d 28, 31 (3d Cir.1995). *See also General Elec. Co. v. United States,* 221 Ct.Cl. 771, 610 F.2d 730, 734 (1979) (rules of interpretation applicable to statutes are appropriate tools of analysis for determining the meaning of regulations).

■ Black's Law Dictionary defines "substantial" as "[o]f real worth and importance; of considerable value; valuable[;] [b]elonging to substance; actually existing; real; not seeming or imaginary; not illusive; solid; true; veritable[;] [s]omething worthwhile as distinguished from something without value or merely nominal[;] [s]ynonymous with material." Black's Law Dictionary, 6th ed. (1990) (citations omitted). The word "substantial" in Treas. Reg. § 1.41–5(d) must mean that, in order to satisfy the substantial rights requirement, the researcher must retain more than minimal rights to the research.

General principles of property law regarding the rights associated with property ownership provide guidance as to the types of rights that may be deemed substantial. These rights include the right to possess, use, and dispose of the property, *see Phillips v. Washington Legal Found.*, 524 U.S. 156, ——, 118 S.Ct. 1925, 1932, 141 L.Ed.2d 174 (1998), and the right to exclude others, *see Nollan v. California Coastal Comm'n*, 483 U.S. 825, 831, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987).

■ Treas. Reg. § 1.41–5(d) and the examples thereto compel certain conclusions regarding the meaning of "substantial rights." One of these conclusions is that the researcher's right to use research results is relevant to whether the researcher has retained substantial rights. For example, Treas. Reg. § 1.41–5(d)(2) provides that the researcher retains no substantial rights when "the taxpayer performs research under an agreement that confers on another person the exclusive right to exploit the results of the research." This suggests that the retention of some right to use the research is a minimum prerequisite for satisfying the substantial rights requirement. See also Examples 1–4 of Treas. Reg. § 1.41–5(d)(6) contrasting the researcher who retains "no rights to the research" and thus is "fully funded," with the researcher who retains the "right to use the results of the research in carrying on [its] business."

■ The regulation also indicates that neither the researcher nor the funding entity need retain exclusive rights to the research in order to meet the substantial rights requirement. *See* Example 5 of Treas. Reg. § 1.41–5(d)(6) (describing a sponsored research arrangement in which both the sponsor and the researcher have substantial rights).

■ In addition, Treas. Reg. § 1.41–5(d)(2) explicitly provides that "incidental benefits to the taxpayer from performance of the research (for example, increased experience in a field of research) do not constitute substantial rights in the research." Therefore, plaintiff does not retain substantial rights in the research solely by virtue of the experience gained as a result of performing that research, even if the experience may be useful or valuable in obtaining and performing other projects.

■ As defendant suggests, an important source of guidance regarding the meaning of "substantial rights" under the I.R.Code can be found in the body of law for determining whether a transfer of rights in a patent (or unpatented technology or know-how) is a sale or exchange upon which capital gain or loss should be recognized. Under I.R.C. § 1235, a patent holder must transfer all "substantial rights" in the patent in order for the transfer to constitute a sale or exchange of a capital asset. *See* I.R.C. § 1235(a) ("[a] transfer … of property consisting of all substantial rights to a patent, or an undivided interest therein which includes a part of all such rights, by any holder shall be considered the sale or exchange of a capital asset held for more than 1 year …."). Case law of the Court of Claims and sister circuit courts of appeal applies this principle to transfers of other forms of intellectual property, such as trade secrets, or unpatented technology, such as technical data and know-how. *See, e.g., Hooker Chems. & Plastics Corp. v. United States*, 219 Ct.Cl. 161, 591 F.2d 652, 659 (1979) (know-how); *E.I. Du Pont De Nemours & Co. v. United States*, 153 Ct.Cl. 274, 288 F.2d 904, 912 (1961) (trade secrets); *Taylor–Winfield Corp. v. Commissioner*, 57 T.C. 205, 213, 1971 WL 2610 (1971), *aff'd*, 467 F.2d 483 (6th Cir.1972) (know-how).

These cases, involving determinations of which rights retained by the transferor will be deemed "substantial" so as to prevent the transfer from constituting a sale or exchange entitled to capital gains treatment, are instructive. They hold that the right to prevent unauthorized use or disclosure is a substantial right which, if retained by the transferor, will preclude the transfer from being deemed a sale. *See Bell Intercontinental Corp. v. United States*, 180 Ct.Cl. 1071, 381 F.2d 1004, 1015 (1967) ("the 'substantial right' in a patent, the retention of which by the grantor will preclude a sale, … [is] the right to exclude others from making, using or selling under the patent grant"); *E.I. Du Pont*, 288 F.2d at 912 (dis-

position of trade secret did not constitute sale where transferor retained right to prevent further disclosure of trade secret); *Taylor–Winfield,* 57 T.C. at 219 (transferor's retention of control over unauthorized disclosure of know-how was a substantial right whose retention precluded sale). Under the contracts in this case, it is clear that only the government held the right to prevent the unauthorized use or disclosure of the research results and that plaintiff did not retain this right.

The right to control use or disclosure is not the only substantial right in connection with intellectual property. Other substantial rights include the discretion to terminate the transfer of the property, *see Bell Intercontinental,* 381 F.2d at 1020–22, and the right to use or disclose a trade secret or know-how, *see Ofria v. Commissioner,* 77 T.C. 524, 1981 WL 11226 (1981). The Tax Court in *Ofria* concluded that the transfer to the government of unlimited rights to use and disclose the data constituted a transfer of all substantial rights to the data (and therefore a sale) when the contractor did not retain the right to use or disclose the data, and its ability to use the data depended on the government's public disclosure of such data. *Id.* at 545 n. 9.

Whether a retained right is substantial depends on the circumstances and the commercial or practical value of the retained right. *See Bell Intercontinental,* 381 F.2d at 1018, 1021; *Hooker,* 591 F.2d at 658. In *Hooker,* a New York corporation transferred patent rights and know-how concerning the chemical treatment of metal surfaces for bonding and rustproofing, to two European corporations that received exclusive rights to use the patent and know-how in several European countries, as well as the right to prevent unauthorized use of the patent and know-how in those countries. *Id.* at 655. Although Hooker, to avoid antitrust problems, reserved the right to sell products relating to the chemical treatment to customers in the transferees' geographic territory, the court determined that this right was of no practical value, because its exercise was not commercially feasible, and thus that the re-

tained right was not substantial. *Id.* at 658–59.

In this case, the government's unlimited right to use and disclose plaintiff's technical data considerably diminished, if not destroyed, the commercial value of plaintiff's right to use the results of its research, a right derived from the competitive advantage to the researcher over others. *Cf. Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1011, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984) (economic value of property right in trade secret lies in competitive advantage over others, by virtue of its exclusive access to the data; disclosure or use by others destroys that competitive edge). The government's power to exercise an unlimited right to use and disclose the technical data destroys plaintiff's competitive advantage.

The potential destruction of plaintiff's competitive advantage caused by the government's exercise of its unlimited rights to technical data is demonstrated by the government's disclosure of technical data to second sources, which enabled plaintiff's competitors to compete successfully under at least two programs: the Patriot Canister and the VLS programs.

The undisputed facts contradict plaintiff's claim that it retained an unlimited right to use the results of its research. Rather, the parties' contracts and applicable regulations placed considerable restrictions on plaintiff's ability to use the research results, in the form of security classifications and export restrictions. Plaintiff's own representative, Mr. Van Akin, described the Department of State's approval power pursuant to ITAR regulations as "a choke hold on what technology could be exported." Jt.App. 123 (Akin Dep. at 105–06). Plaintiff's actual use of its research results is immaterial, since the parties' contracts and applicable regulations gave the government the power to completely prevent any use of such research.

While the patent rights clause gave plaintiff the right to file patent applications, the government retained veto power. Defendant exercised this veto power, based on national security concerns, in disallowing plaintiff's patent application for a LANTIRN compo-

nent developed under Lockheed's IRAD program.

The patent rights clause also limited plaintiff's rights to the results of its research in providing that plaintiff's failure to file a patent application within a specified period of time gave the government the option of requiring plaintiff to transfer the entire title to the subject invention to the government. Plaintiff then retained only a revocable non-exclusive royalty-free license in any patent relating to the subject invention. Plaintiff's argument that the patent rights clause did not convey any rights to plaintiff's research that was not a subject invention, ignores that the technical data clause encompasses aspects of plaintiff's research that were not subject inventions, giving the government unlimited rights to such research.

Plaintiff's considerable revenues for its work on contracts with the government, and on subsequent contracts incorporating technology developed during those contracts, does not prove that plaintiff retained substantial rights. There is no doubt that plaintiff gained a great deal of knowledge and experience from such work, and that this knowledge and experience gave plaintiff a competitive advantage in competing for further defense contracts and the know how to develop other products. However, again, these are not substantial rights, but merely incidental benefits under Treas. Reg. 1.41–5(d)(2), which provides that "[i]ncidental benefits to the taxpayer from performance of the research (for example, increased experience in a field of research) do not constitute substantial rights in the research."

The restrictions on plaintiff's ability to use the results of its research, and the government's unlimited rights, greatly curtailed its right to use its research, which thus cannot be deemed "substantial."

The recoupment provisions of the parties' contracts provide additional support for the conclusion that plaintiff did not retain substantial rights in the research. Treas. Reg. 1.41–5(d)(3) provides that "[a] taxpayer does not retain substantial rights in the research if the taxpayer must pay for the right to use the results of the research." As previously stated, the recoupment provisions required plaintiff to "[r]eimburse the U.S. Government for a fair share of U.S. Government expenditures for nonrecurring costs applicable to the items [to be sold]." Recoupment applied to all sales, other than sales to the U.S. government, "by a defense contractor of products, technology, material, services, and/or development or production techniques that were originally developed, improved, or produced using DOD appropriations/funds." Stip. Exh. 23 (DAR § 7–104.64(a)(1) and (b)(1); FAR § 52.235–7002).

Plaintiff argues that the recoupment provision does not require plaintiff to pay for the right to use the results of its research (and therefore did not deprive it of substantial rights in the research), because the provision applied only to certain types of sales or agreements. It points out that it has in fact paid recoupment only in connection with one program (the Pave Penny navigational device). (While recoupment was paid in connection with the sale of the VLS to Canada, the U.S. government subsequently decided to reimburse this charge.)

Nevertheless, the recoupment provision applied to *all* domestic and foreign commercial sales (*i.e.* other than to the U.S. government). That plaintiff has not actually been required to pay recoupment except for one program does not change plaintiff's contractual obligation to pay recoupment, nor the government's contractual right to enforce that obligation, in connection with any commercial sale. Pursuant to Treas. Reg. 1.41–5(d), the determination of whether the researcher has retained substantial rights is based on the terms of the agreement providing for the research, not on subsequent events.

Plaintiff claims that recoupment provisions are intended to ensure that the customer, rather than the contractor, reimburses the DOD or U.S. Government (Treasury) for its investment costs, and therefore that recoupment is not intended to be a payment for use of the research. However, whether the contractor or the customer is intended to be the ultimate source of the payment is irrelevant since, as defendant correctly points out, the recoupment provision in the parties' contract

imposes the *obligation* to pay recoupment on the contractor, not on the purchaser. Thus any agreement between the contractor and the customer that the customer pays is merely a cost-shifting device (the sales price being diminished by the amount of the customer's "payment").

### Conclusion

For the reasons stated above, the court concludes that plaintiff retained no substantial rights in the research for which it here claims a research tax credit, that this research therefore was fully funded for purposes of I.R.C. § 41(d)(4)(H), and thus that none of plaintiff's research expenses qualify for the credit. Accordingly, plaintiff's motion for partial summary judgment is denied and defendant's cross-motion for summary judgment is granted.

The parties have stipulated that the court's determination regarding the substantial rights issue is to be extrapolated to plaintiff's claim as a whole. *See* Stipulation Regarding Determination of Issues, ¶¶ 3(a), 4(a). Therefore, the court's determination, in the context of the four Major Programs, that none of plaintiff's research expenses qualify for the credit, extends to, and defeats, plaintiff's entire QRE claim, entitling defendant to final summary judgment. Moreover, since the court's determination of the substantial rights issue disposes of plaintiff's entire claim, the pending cross-motions on the service contracts and subcontractor issues are denied as moot.